STEAMSHIP COMPANY *v.* UNITED STATES.

UNITED STATES *v.* STEAMSHIP COMPANY.

The contracts entered into by the United States and the Pacific Mail Steamship Company, for carrying the mails by the latter between San Francisco and certain Asiatic ports, considered. *Held*, 1. That the company has no claim to compensation other than sea postage for carrying them in vessels which had not been accepted by the Postmaster-General. 2. That it is entitled to recover, under the contract of Aug. 23, 1873, for services performed, pursuant to its terms, in vessels which he had, under the contract of Oct. 16, 1866, accepted. 3. That the annulment of the contract by the act of March 3, 1875, c. 128, does not affect the company's claim for such services on a voyage commenced before that date.

APPEALS from the Court of Claims.

The facts are stated in the opinion of the court.

*The Solicitor-General* and *Mr. Edwin B. Smith,* Assistant Attorney-General, for the United States.

*Mr. John F. Farnsworth, Mr. William E. Chandler, Mr. Philip Phillips, Mr. Roscoe Conkling, contra.*

MR. JUSTICE MILLER delivered the opinion of the court.

These are cross-appeals from a judgment of the Court of Claims. The Pacific Mail Steamship Company asserted in that court a claim for $531,666.66, and recovered a judgment for $41,666.66. The United States desire to reverse this latter judgment. The company seeks to recover here the full sum claimed below.

The suit grows out of a contract for carrying the mail from San Francisco to certain Asiatic ports. The facts, as found by the Court of Claims, and so far as is necessary to our decision, will be stated as we proceed.

The steamship company entered, on the 16th of October, 1866, into a contract with the United States to carry a monthly mail from San Francisco to China and Japan, *via* the Sandwich Islands, for the sum of $500,000 per annum, for a period of ten years.

These mails were to be carried in first-class American sea-

going side-wheel vessels of from 3,500 to 4,000 tons burden, to be inspected and accepted by the Postmaster-General. The company, in due time, entered upon the discharge of this duty. The steamships "Colorado," "Great Republic," "China," "Japan," "America," and "Alaska" were duly inspected and were accepted by the government for that service. They had been in actual use in performing the contract for several years, when Congress by the act of June 1, 1872, c. 256, making appropriations for the service of the Post-Office Department for the next fiscal year, enacted as follows: —

"SECT. 3. . . . For steamship service between San Francisco, Japan, and China, five hundred thousand dollars; and the Postmaster-General is hereby authorized to contract with the lowest bidder, within three months after the passage of this act, after sixty days' public notice, for a term of ten years, from and after the first day of October, eighteen hundred and seventy-three, for the conveyance of an additional monthly mail, on the said route, at a compensation not to exceed the rate per voyage now paid, under the existing contracts, and upon the same conditions and limitations as prescribed by existing acts of Congress in reference thereto, and the respective contracts made in pursuance thereof; and the contractors, under the provisions of this section, shall be required to carry the United States mails during the existence of their contracts without additional charge, on all the steamers they may run upon said line, or any part of it, or any branch or extension thereof: *Provided,* that all steamships hereafter accepted for said service shall be of not less than four thousand tons register each, and shall be built of iron, and, with their engines and machinery, shall be wholly of American construction; and shall be so constructed as to be readily adapted to the armed naval service of the United States, in case of war, and, before acceptance, the officers by whom they are inspected shall report to the Secretary of the Navy and the Postmaster-General whether this condition has been complied with. . . . And the government of the United States shall have the right, in the case of war, to take for the use of the United States any of the steamers of said line, and, in such case, pay a reasonable compensation therefor: *Provided,* the price paid shall in no case exceed the original cost of the vessel so taken; and the provision shall extend to and be applicable to the steamers of the Brazilian line hereinafter provided for."

"Sect. 6. That if the contract for the increase of the mail service between San Francisco and China and Japan to a semi-monthly service shall be made with the Pacific Mail Steamship Company, or shall be performed in said company's ships, or the ships of its successors in interest, the moneys payable under such contract shall be paid while the said company, or its successors in interest, shall maintain and run the line of steamships for the transportation of freight and passengers, at present run between New York and San Francisco, *via* the Isthmus of Panama, by the said Pacific Mail Steamship Company, and no longer: *Provided,* that said require-ments shall, in all respects, apply to any party contracting for the mail service between San Francisco and China and Japan, as well as to the Pacific Mail Steamship Company."

After advertising for bids for this service, and receiving one from the Pacific Mail Company, the Postmaster-General and the company signed, Aug. 23, 1873, a contract, which is too long to be copied here in full. On the part of the company, after re-citing the times of departure and places of delivery of the mails which they bound themselves to carry for the period of ten years, commencing on the first day of October, 1873, there oc-curs this sentence, on the construction of which the present con-troversy hinges : " And the said contractors do further covenant and agree with the United States, and do bind themselves, that the steamships hereafter offered for the service shall be of not less than four thousand tons register each, and shall be built of iron, and, with their engines and machinery, shall be wholly of American construction, of the best materials and after ap-proved models, and shall be so constructed as to be readily adapted to the armed naval service of the United States in case of war ; and before acceptance, the officers by whom they are inspected shall report to the Secretary of the Navy and the Postmaster-General whether this condition has been complied with ; and, further, that the said steamships, after acceptance by the Postmaster-General, and during the period they may be employed in conveying the mails, shall be kept up by altera-tions, repairs, and additions, as the exigency may require, fully equal to the best state of steamship improvement attained ; and if not so kept up and maintained, they may be rejected by the Postmaster-General of the United States, as not meeting

the requirements of the act of Congress authorizing the addi
tional monthly service, and other satisfactory steamships re-
quired in their place." The question is whether the company
was bound by this contract to carry this additional semi-
monthly mail in vessels of the class here described and in no
others, or whether, while exercising due diligence, to have as
many vessels of that kind as were necessary, in addition to
those which had been accepted under the first contract, these
last could be used in performing the contract. Counsel for the
government maintain that, inasmuch as under this contract but
one trip was made by a vessel of the class here described, the
service rendered by other vessels which had been accepted by
the Postmaster-General, before this contract was made, was
not a service in compliance with the contract for which they
are entitled to receive the $41,666.66 per trip, while the con-
tention of the company is, that it was at liberty to use ships
already accepted for this service, being the same service which
they were then performing under the former contract, except
that it had now become a semi-monthly instead of a monthly
mail, and that by the use of the word " hereafter," in the new
contract, reference was had to such new vessels as it might
become necessary to introduce into that service.

It will be observed that " hereafter " occurs in the act of
1872, under which the contract was made, and in the same
connection. It has no sense either in the statute or the con-
tract, unless there is an implied reference to vessels already
accepted. If we suppose that while Congress required the con-
tract to be let, after public notice, to the lowest bidder, but at
no higher rate than $500,000 per annum, it also had in mind
the great probability that the company which was performing
the contract for a monthly mail at that price would obtain the
contract for the additional service, we can readily understand
the use of the word " hereafter " both in the statute and in
the contract. It being understood that six vessels of that
company had already been inspected and accepted by the
Postmaster-General for that service, and were then engaged
in it, the only reasonable use of the agreement that " steam-
ships hereafter offered " should be of the new class, is that
those already accepted might be used under this contract

for the same service, but that such other vessels as the service should require must be of the higher class described in the statute.

There are many reasons to believe that while Congress observed its uniform policy of letting such contracts to the lowest bidder, thus inviting competition, it felt reasonably sure that in the present case the Pacific Mail Company would get it, if let at all, as the maximum of $500,000 per annum left an alternative that no contract might be made.

One of these considerations is that the company had for some time been making semi-monthly trips on the same route in pursuit of their general business as carriers, and had carried the mail every trip, receiving for the trip, for which they had no contract, what is called the sea postages,— a phrase not explained in the record, but understood to mean the postage received by the United States for the mail matter actually carried. If the company was doing this already for such a small sum, generally less than $1,000 per round trip, it was to be supposed they could underbid any one else. Besides, it was well known that no one else was prepared to perform the service, or could afford to put in a competing line for it. That Congress contemplated the taking of the contract by this company as extremely probable is shown by the provisions of the sixth section of the act, that if the contract was made with that company *or performed in its ships* the money should only be paid so long as that company should continue its line from New York to San Francisco by way of Panama. We have here not only the probability that this contract would be made by the company which already was running a line of steamers from New York to San Francisco and was doing the work from San Francisco to Asia, which was now to be doubled, but we have the one made to depend on the performance of the other, and the distinct intimation that the new service might be performed in the ships of that company. Now, though this does not necessarily mean ships then in existence, when taken in connection with the use of the word "hereafter," as we have suggested, it adds to the force of the implication that ships of that company which had already been accepted might still be used for a service not new, but increased in the

frequency of voyages, if the contract was awarded to the company then performing the service.

The construction of this contract was referred by the Postmaster-General to the Attorney-General in the summer of 1874, the question being whether the contract had been forfeited or was liable to be declared so by reason of the fact that while the new service was to commence Oct. 1, 1873, no vessel of the higher class described in the contract had been offered.

The Solicitor-General in a very careful opinion held that while the literal terms of the contract might be held to mean that the additional service should be wholly performed in the higher class of vessels, the act of Congress under which the contract was made clearly did not require this.

He says : " It seems to me plain that the act of 1872 did not require such additional mail service in steamships of the new class, unless such became necessary." And while he is of opinion that the language of the contract does require this, he considers it to be an immaterial part of the agreement, and concludes that the failure to provide the new vessels when the work was as well done by those already accepted did not authorize a forfeiture of the contract.

The Attorney-General also gave an opinion, in which, while he declines to adopt all of the Solicitor-General's views, he says : " I am of opinion that it was not an essential part of the contract that the new iron steamships should be furnished by the 1st of October, 1873, if at that time it satisfactorily appeared that they would be furnished within a reasonable time thereafter." 14 Op. Att.-Gen. 674. It does not appear to us that there is such a discrepancy between the language of the statute and of the contract as is suggested by the Solicitor-General, and if there were, the following words found in the contract would make the statute govern the case : " This contract shall in all its parts be subject to, and in all respects governed by, the requirements and provisions of the third and sixth sections of the act of Congress approved June 1, 1872." These are the sections we have copied, and which the Solicitor-General construes as we do, not to require the steamships of the new class until other vessels became necessary besides those already accepted.

That such was the understanding of the parties to this contract receives strong confirmation from language found in the bid or offer of the company, which was accepted without qualification by the Postmaster-General. It is this: "We are now building two iron propellers of about 4,500 tons register, capable of steaming twelve knots, and propose, as soon as practicable, with the limited facilities now available in America, to build two more steamers of like construction, but larger and of higher speed, all of which we shall offer for the service in question. Until they can be put into commission, and afterwards, whenever circumstances may require us to relieve them temporarily, we propose to perform the service with one of the steamships heretofore accepted for the China mail service, viz., 'America,' 'Japan,' 'China,' 'Great Republic,' 'Alaska,' and 'Colorado,' or in case of need with the 'Constitution,' heretofore accepted as a spare steamer for said service."

It does not appear that this was objected to, and the finding of the Court of Claims is that the proposal was accepted as made; and if there be any difficulty in construing the language of the contract, it is fair to presume that it was not intended to conflict directly with such an important part of the proposal, after it had been accepted without objection.

Two acts of the claimant are much relied on to sustain the construction of the contract now asserted by the government's counsel, and it must be confessed that they tend to show that, about the time the performance of the contract should have commenced, some of the officers of the steamship company entertained the view that all the additional service was to be performed in the new class of vessels.

The first of these is a letter written in behalf of the steamship company by S. K. Holman, vice-president, in answer to one from the Post-Office Department. This latter letter is dated Oct. 24, 1873, and is addressed to George H. Bradbury, president of the company, and requests him to put in writing, for the use of the department, the explanation which, in a recent personal interview with the Postmaster-General, he had given for failing to commence the additional service on the 1st of October, as required by law and contract.

To this Mr. Holman says: —

"SIR, — In the matter of the contract between the Postmaster-General and the Pacific Mail Steamship Company for an additional semi-monthly mail service between San Francisco, Japan, and China, said service to be performed with American-built iron steamships of not less than 4,000 tons register, and to have been commenced on Oct. 1, 1873, we beg to submit the following, which will explain the reason of our failure to have placed the ships on the line as per contract."

He then proceeds at length to explain the difficulties encountered in the construction of the two ships " City of Pekin " and " City of Tokio," which had prevented the company from placing in time any vessel of that class in the line. It must be conceded that this language and the whole tenor of the letter impliedly admit that it was the duty of the company under the contract to furnish the new class of vessels at once.

This is further confirmed by the fact that while the mails were carried twice a month from October 1 to December 31, on vessels already accepted under the old contract, the sea postage for this service, amounting to $1,510.81, was, on the 11th of February, 1874, paid to the company at its request.

But immediately thereafter the company refused to receive any more of the sea postage, though warrants therefor to the amount of $5,105.41 were tendered, and it continued to perform the additional service, and to demand the contract price for it, until Congress, by the act of March 3, 1875, c. 128, in the exercise of the power reserved in the act of June 1, 1872, repealed that act and annulled the contract.

But the question to be decided is, not how one or more of the officers of the steamship company construed the contract several months after it had been made, but what was the intention of the parties thereto, and what did Congress mean when it enacted this particular proviso. We have already said that by a just construction of its terms the contract conforms to the statute, and that the latter did not require the additional service to be performed exclusively in the new class of vessels. We have shown that, when bidding for the contract, the company guarded this point by expressly stating they should use the old vessels.

Is all this to be overcome by the language of a single officer

of the company, and that not the highest, and whose authority in the company is not shown? There is no evidence that the president of the company, or its board of directors, held these views.

So the receipt of the sea postage for three months may have been by the mistaken action of some inferior officer of the company. Long before the new contract was to begin the company had been performing this additional service and receiving the sea postage as compensation for it, and it may have been that some officer, unaware of the new contract, had continued to ask for and receive these postages after it went into effect. We do not think these acts are sufficient to overcome the construction of the contract arising from the statute and the language of the instrument, and they certainly do not estop the company from asserting the rights which the true construction of it gives them.

The Court of Claims finds that the additional mail service was performed by twelve round trips, beginning Oct. 17, 1873, and terminating Jan. 16, 1875, and that of these voyages six were made by ships which had been accepted under the first contract, and six by vessels which had never been accepted by the Postmaster-General. We are of opinion that claimant can only recover on this contract for the service rendered by vessels which had been accepted, and that it cannot recover on the contract for mails carried in vessels which had not been accepted under the contract. As to these, the sea postages offered by the Postmaster-General must be, as it was before the making of the contract, the only compensation. There may be deductions for non-performance of duty, or other matters provided in the contract, in regard to which no finding is made by the Court of Claims, but which will be open to inquiry on the return of the case to that court.

As regards the sum allowed claimant for the voyage of the " City of Pekin," we think the Court of Claims was clearly right. That vessel had been examined and accepted by the Postmaster-General, as one of the new and higher class of vessels, and the mails had been delivered to her at San Francisco, on the 20th of February, 1875, and she had started on the round trip ten or twelve days before Congress passed the stat-

ute annulling the contract, and she carried the mails under that contract on the voyage out and the return voyage. We are of opinion that the repeal of the statute and the annulment of the contract were not designed to operate on that voyage, and that in that respect the judgment of the Court of Claims was right.

Its judgment in regard to the other trips will be reversed, and the case remanded to it with instructions to render a judgment in conformity to this opinion; and it is

*So ordered.*