ILLINOIS MIGRANT COUNCIL, a not-for-profit corporation, Individually, et al., Plaintiffs,

v.

Alva L. PILLIOD, Individually and in his official capacity, et al., Defendants.

No. 74 C 3111.

United States District Court, N. D. Illinois, E. D.

July 29, 1975.

Bruce L. Goldsmith, Ill. Migrant Legal Assistance Project, David A. Goldberger, Roger Baldwin Foundation, Barbara P. O'Toole, Kenneth Montgomery, American Civil Liberties Union, Chicago, Ill., Robert S. Catz, Migrant Legal Action Program, Inc., Washington, D.C., for plaintiffs.

Arnold Kanter, Asst. U. S. Atty., Chicago, Ill., for defendants.

## MEMORANDUM OPINION

MARSHALL, District Judge.

The Illinois Migrant Council (hereinafter IMC), a not-for-profit corporation, and Arturo Lopez, Larry Sandoval, Elias Montanez, Tessie Alvarado, Isabel Carillo, Fidencio Salinas, Rutilio Arteaga and Ninfa Arteaga,[1] individually, and on behalf of all others similarly situated, bring this action for declaratory and injunctive relief against 9 named and 35 unknown officials of the Immigration and Naturalization Service (hereinafter INS).[2] In substance, the complaint alleges that the INS has conducted and will continue to conduct in the future a pattern and practice of harassment, including illegal searches, seizures, arrests, interrogations, detentions, and mass raids, against the individual plaintiffs and the class, in violation of the plaintiffs' rights under the First, Fourth and Fifth Amendments to the Constitution of the United States.

Jurisdiction is founded on 28 U.S.C. §§ 1331, 2201 and 2202. The plaintiffs' cause of action arises under the First, Fourth, and Fifth Amendments to the Constitution, and 8 U.S.C. § 1357, which delineates certain powers of the INS, and it involves in excess of $10,000 per

---

1. On motion, the plaintiffs Ninfa and Rutilio Arteaga were permitted to withdraw from the action.

2. The defendants were originally sued in both their individual and official capacities. On the plaintiffs' motion, the individual allegations were stricken without prejudice to reinstatement at a later time.

individual plaintiff exclusive of interest and costs.

The plaintiffs seek a preliminary injunction pursuant to FedR.Civ.P. 65. Testimony has been heard and the motion is ready for decision. During the preliminary injunction hearings, the defendants filed a motion to dismiss under Fed.R.Civ.P. 12(b), which was denied after argument. The issue is whether defendants should be enjoined *pendente lite* from entering buildings, dormitories, and/or dwellings where plaintiffs and the members of their class reside without search warrants or probable cause unless they have received consent to enter from the occupants, and to cease arresting, detaining, stopping and otherwise interfering with the travel of citizens and resident aliens of Mexican descent unless the defendants are acting upon probable cause or "articulable facts showing that there is substantial reason to believe such persons have entered the United States illegally." [3]

■ Before analysing the difficult and sensitive issues raised by the plaintiffs' motion, a detailed statement of the facts adduced at the hearings and an analysis of certain exhibits is necessary.[4] Fed.R.Civ.P. 52(a); 65(d). The plaintiffs' evidence falls into four broad and sometimes overlapping categories: street encounters, entries into dwellings, raids on employment centers, and documentary evidence consisting of operations manuals for INS agents. The plaintiffs contend that the evidence demonstrates a continuing pattern and practice of illegal conduct by the INS that requires the issuance of a preliminary injunction. The defendants, on the other hand, assert that all operations of the INS were and will continue to be conducted in conformance with the Fourth Amendment and 8 U.S.C. § 1357(a)(1) (1970), and to the extent that excesses may have occurred, the incidents were isolated and do not establish a pattern or practice of illegal conduct. Alternatively, the defendants contend that the plaintiffs are not entitled to injunctive relief because they have an adequate remedy at law under the Federal Tort Claims Act, 28 U.S.C. § 2680(h) (1974), and *Bivens v. Six Unknown Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971); *Tritsis v. Backer*, 501 F.2d 1021 (7th Cir. 1974). Finally, defendants urge that the court lacks jurisdiction to grant plaintiffs any relief because their success is dependent upon a successful challenge to the constitutional validity of 8 U.S.C. § 1357 (1970), which requires the convening of a three-judge court. 28 U.S.C. § 2282 (1970). Since the jurisdictional question can best be understood after a statement of the facts, it will be discussed after the evidence has been summarized.

## I. *The Facts*

IMC is a federally funded not-for-profit Illinois corporation with nine regional offices in the state. It provides

---

3. The plaintiffs' motion for preliminary injunction.

4. During the course of the hearing a question arose on whether certain depositions taken pursuant to the Federal Rules of Civil Procedure in *Barrera v. Pilliod*, No. 73 C 2138, could be submitted as affidavits by the plaintiffs in this action. The depositions were taken under oath and the deponents were subjected to cross-examination by the Government. Although there was some disagreement over the use of the depositions as affidavits, an examination of authorities establishes that the depositions may be considered affidavits in support of the motion for

a preliminary injunction. *See United States v. Fox*, 211 F.Supp. 25, 30 (E.D.La.1962), *aff'd* 334 F.2d 449 (5th Cir. 1964); *Beauboeuf v. Delgado College*, 303 F.Supp. 861 (E.D.La.1969), *aff'd* 428 F.2d 470 (5th Cir. 1970) (per curiam); 11 C. Wright & H. Miller, *Federal Practice and Procedure*, § 2949, at 475 n. 14 (1973). Therefore, the depositions of Joseph Dungy, Jose Angel Ortiz, Alonzo Solis, Tessie Alvarado, Maria Concepcion Ramirez, and Henry Rodriguez will be considered as affidavits in support of the motion. No opinion is expressed on the question of whether the depositions are admissible as evidence on the merits.

supportive services and acts as an advocate for migrant agricultural workers who are predominantly of Mexican heritage and illiterate in both English and Spanish. Its major goal is to "encourage migrants to leave the migrant stream and to settle as permanent residents in Illinois."[5] The individual plaintiffs are American citizens or permanent resident aliens of Mexican descent. A number of them have permanent residences in Illinois while others are migrant farm workers whose legal residences are in Texas.

The individual defendants are supervisory and field personnel of the INS. With the exception of Pilliod, who was District Director of INS at the time of the commencement of this action, the defendants are all assigned to the Chicago District of the INS. The plaintiffs allege that the defendants are responsible for and participate in the complained of interrogations, investigations, dwelling entries, surveillance and raids upon individual and groups of individuals of Mexican descent or Spanish surnames. The plaintiffs further allege that these activities are all conducted pursuant to the Unites States immigration laws, regulations and policies.

#### A. *Street Encounters*

The plaintiffs presented two instances, apart from incidents during INS area control operations in Mendota and Rochelle, where individuals were allegedly stopped by INS agents and interrogated about their citizenship and their right to remain in the United States. The first incident occurred on September 18, 1974, in Rochelle, Illinois. Larry Sandoval, an American citizen of Mexican descent residing in Rochelle, Illinois, is the Director of the IMC office in Rochelle. Elias Montanez works for the IMC and is a permanent resident alien residing in Rochelle. On the morning of September 18, the two men were driving in Sandoval's car to the IMC office in Rochelle when they passed an INS car heading in the opposite direction. Sandoval proceeded to the IMC office and parked his car on the front lawn of the office. The INS car U-turned and pulled up alongside of Sandoval's car. Three INS agents got out of the car. One asked Montanez where he was born. Montanez responded, "Mexico." The agent then asked for identification which Montanez produced, after the officer threatened to take him to Chicago and put him in jail if he refused to produce it.[6] The agent looked at card and finding it satisfactory, returned it.

After the exchange with Montanez, the agent requested identification from Sandoval. When he refused to produce any, the agents told him they would have to take him to Chicago. Sandoval replied that the agents could take him to Chicago because he was not going to give them any identification. The agent then grabbed Sandoval's arm and placed him in the back seat of the agents' car. Once inside the car, the agent again asked for some identification and Sandoval refused stating that he did not think it was right for anybody to interfere with a citizen's rights. Upon Sandoval's implied assertion that he was a citizen, the agents ordered him out of the car and they left.

The second incident involved Arturo Lopez, the Deputy Director of IMC. In the first week of October, 1974, Lopez was walking to his office at 19 West Jackson in Chicago when he was approached by two "Anglos" who asked him if he lived in the area. Thinking they were lost and wanted directions, he responded, "no, but I work around here."

---

5. Plaintiffs' memorandum in support of motion for preliminary injunction.

6. Tr. 146. There is some conflict in the testimony of Mr. Sandoval and Mr. Montanez regarding the exact conversation which took place between Montanez and the agent. *Compare* Tr. at 96, with Tr. at 145–46. Because Mr. Montanez was a participant in the exchange, his version is accepted as the more accurate. The agents did not testify.

The following colloquy then took place (Tr. 171):

Q. And then what happened?

A. And then the person asked me where I was born.

Q. And what did you say?

A. It upset me, and I felt they were kind of—and I said, "Well, why? Where were you born?"

Q. And then what happened?

A. He said, "Well, I am from the Immigration Department." And then he pulled out a little wallet and just flashed it open and put it back in his pocket.

Q. And then what happened?

A. And then I said, "Well, I was born in New Mexico." I said "Where were you born?"

And the guy said, "Chicago." And then they said, "Have a nice day." And they left.

Q. Could you tell me how you were dressed?

A. I had the clothes on that I have got on now.

Q. Were you doing anything unusual at the time?

A. Just walking down the street.

Mr. Lopez is an American citizen of Mexican descent. At the time of this encounter, he was walking down the street, attired in boots made in New Mexico, levis, a shirt purchased in Illinois, and a jacket purchased in Mexico.[6a]

## B. *Area Control Operations*

The focal point of the plaintiffs' case and the most egregious conduct of the defendants occurred during the raids or "area control operations" conducted by the INS in Rochelle and Mendota, Illinois. No search or arrest warrants were issued for either of these operations.

The preparation for the two raids began on September 12, 1974 when the Chicago District received a communication from the Washington Office that illegal aliens were being employed in the Del Monte Food Company and Maclean Company plants in Rochelle, Illinois. Thereafter on September 16, 1974, defendant Georgetti travelled to Rochelle to make inquiries and select targets for a possible area control operation. Some of the targets were selected on the basis of information provided by an informer. This information consisted of locations where "conceivably there were illegal aliens residing," including La Hacienda, the Del Monte Men's Cottages, and an apartment building located at 403½ Lincoln Highway.

Upon completing his investigation of the Rochelle area, Giorgetti drove to Mendota, Illinois. There were no informers in Mendota but the local police did provide Giorgetti with a list of addresses where illegals might be found.[7] In addition to that information, Giorgetti had a letter from the Chicago Tribune's "Action Express" requesting a reply to a letter sent to "Action Express" regarding the employment of illegal aliens at the Motor Wheel plant in Mendota, and an anonymous letter from concerned citizens containing a list of names of Mexicans at Motor Wheel. The letter implied that the individuals on the list were in the United States illegally.

Until Giorgetti's visit to Rochelle and Mendota, no definite plans had been made for any operations in the towns. After his investigation, however, the two area control operations were scheduled. On September 17, 1974, agents were briefed with particular emphasis on Rochelle. A second briefing was held on September 25, 1974, for Mendota. During these briefings, Giorgetti informed the agents that United States citizens and resident aliens would be en-

---

6a. *See also*, the street encounter experience of Jose Angel Ortiz described at p. 890, *infra*.

7. Tr. 216.

countered and that they should be "inconvenienced as little as possible, and that they would be allowed to proceed as to that extent possible in the day's normal activities."[8] No specific instructions were issued regarding the Fourth Amendment rights of citizens or aliens. Instead, the officers were expected to rely on their previous training and a handbook entitled *Authority of Officers of Immigration and Naturalization Service to Make Arrests.*[9]

### 1. *The Rochelle Operation*

At approximately 4:30 a. m. on September 18, 1974, Giorgetti and 32 armed INS agents began simultaneous operations on the preselected targets in Rochelle. Divided into subunits, the agents searched Del Monte Plants 109 and 110, Del Monte's women's residences, La Hacienda (consisting of two buildings) containing approximately 55 women, another migrant camp known as Rancho Colorado, Stokely Van Camp plants, and other locations which became known to the agents as the operation progressed. The raids were conducted during the early morning hours because news of the INS presence spreads quickly, thus allowing illegals to escape.

The search of La Hacienda began at approximately 4:30 a. m. when several agents (a total of six agents were ultimately involved) knocked on the unlocked door of the large building in the two building La Hacienda complex. The agents opened the door, walked in, and identified themselves. They then proceeded from bedroom to bedroom demanding that the women occupants produce their papers. After completing their interrogations, the agents left the large building. No arrests were made.

Simultaneous with the entry of the large building, at least two INS agents entered the small building. The same pattern was followed as in the large building. Agents entered bedrooms, some of which were darkened and the people asleep, announced they were from the INS and ordered the women to get their papers. Similarly also, no one was arrested.

In summary, in each instance the raid was conducted at approximately 4:30 a. m. while the female residents were asleep. In some cases agents came into darkened rooms with flashlights and demanded the occupants' papers. Many of the women were not dressed when the agents entered; yet they were required to obtain their papers without an opportunity to change from their sleeping clothes. There is no evidence that the agents used any physical force against the women or that any abusive language was used. No illegals were found in La Hacienda.

In addition to searching the women's residences, immigration agents also searched the men's cottages or barracks at Del Monte. Most of the male migrants who work at Del Monte live in a cluster of approximately 30 cottages. Each cottage is occupied by 9–12 men. The depositions of Jose Angel Ortiz, Henry Rodriguez and Joseph Dungy establish the method of operation followed by the INS. The agents approached the cabins and entered them without permission. They turned on the lights and questioned each individual regarding his status. Those who were not awakened by the entry or already awake were shaken by agents to awaken them. Exactly how many cottages were entered is not clear. Mr. Ortiz stated in his deposition that he was with agents when they entered cottages 9, 10, 11, 19 and 22.[10] Mr. Ortiz also stated that when he could not produce his green card (which evidences legal residency) which was in his mother's possession, one agent called him a "wetback." The agent then grabbed him by the neck and took him from barracks to barracks as the searches continued. Mr. Ortiz was

---

8. Tr. 209.

9. Tr. 226, 227, 138.

10. Deposition of Jose Angel Ortiz, at 9.

subsequently released when a Mr. Mendoza, who also worked for Del Monte, told the agents that Ortiz' papers were in order.

Mr. Ortiz had a further encounter with immigration after the agents released him. While he was walking on the street with another man, two agents in an INS car stopped them and asked him for his papers. Ortiz complied and was allowed to leave.

The men's and women's dormitories at Del Monte were not the only residences searched by INS agents in the early morning hours of September 18, 1974. Alonzo Solis, an American citizen, and a migrant worker, lived in a small two-room house with his wife and a 1½ month old child on the Harry Ross farm a few miles outside Rochelle. Sometime between the hours of 4:00 and 5:00 a. m., Mr. Solis was awakened by someone kicking on his door. Solis asked who was there but there was no response, only more kicking. Solis, who was not dressed, then got up and opened the door. A man then identified himself as from immigration and tried to force or push his way in. The agent desisted after the Solis child began crying and Solis ordered the agent out. Solis then put on his pants, went outside and showed the agent his "certificate." With this, the agent said, "All right," and left. Solis could not say whether agents searched any of the other 15–18 houses on the Ross farm.

In addition to the residence searches, the INS also conducted operations at Del Monte Plants 110 and 109 at approximately 5:00 a. m. Agents entered the east door of plant #110, above which is a posted sign reading, "No Admittance; Employee Personnel on Duty Only." The agents approached Bruce Reiskamp, identified themselves, and asked where the migrant help worked. Reiskamp directed the agents to Mr. Keyes, who was his immediate supervisor, the policy of Del Monte being that only the most senior supervisory person on duty could give others permission to enter the plant.

The agents identified themselves to Keyes and said they were there to check migrants. The agents then asked where the migrants were and Keyes told them they were working throughout the plant. When the agents left to begin their search for illegals, Keyes called his supervisor, Mr. Richardson. Richardson then came to the plant and saw six to eight agents questioning everyone who appeared to be of Latin heritage. He approached the agent in charge of the group checking the workers and asked him for his credentials, a list of all the agents, and the names of all those arrested. Although the agent promised this information would be forthcoming, it was never provided.

Several salient facts surrounding the agents' entry need to be noted. First, they did not ask permission to search the plant for aliens; they announced their presence and said they were there to check the migrants. Second, both Keyes and Richardson believed they had to allow the agents to search the plant. Keyes said he was intimidated by the agents and feared that he could be arrested if he obstructed them. Similarly, Richardson testified that because of prior experiences with INS raids, the agents did not need advance permission to enter the plant. Third, there was no testimony regarding the INS activities in plant 109. Lastly, Del Monte is not a party to this law suit.

### 2. *The Mendota Operation*

The Mendota operation, which had been planned and briefed concomitantly with the Rochelle operation, began at 8:00 a. m. on September 26, 1974. The bulk of the 30 agents led by Giorgetti first went to the Motor Wheel plant. Giorgetti and two other agents entered the plant and spoke to Mr. Palmisano, the personnel manager. He was shown a list of individuals of which approximately 95 per cent were Spanish surnamed. Giorgetti told Palmisano that he wanted to speak to the individuals on the list to determine whether they were

illegals. Believing that he was required by law to allow the agents to question the individuals on the list,[11] Palmisano instructed the shop foreman to bring the employees whose names appeared on the list to a conference room. Apparently only 19 employees were interviewed (the list contained 64 names) of which 10 were arrested. Five of them subsequently returned to work.

After completing the investigation at Motor Wheel, the agents proceeded to several other industrial targets including the Hart Carter Corporation and a Del Monte plant. In addition to the industrial plants, agents went to hotels, boarding houses and other private dwellings. Some of these dwellings were entered, but there is no direct evidence describing the nature of the entries. The operation resulted in the apprehension of 108 illegal aliens, 104 of which remained in detention at the time of the instant hearing.

█ The foregoing description of the Mendota operation was drawn wholly from testimony received during the hearing on the preliminary injunction. The plaintiffs have, however, pleaded that during the INS raids in Mendota, agents followed the pattern of dwellings searches testified to regarding the Rochelle operation. Again, the allegations are that these searches were aimed at all Spanish surnamed people and individuals whose heritage appeared Mexican. Similar allegations are made regarding individuals who were stopped while on the street or travelling in their cars. These allegations are, however, made in an unverified complaint and therefore cannot be considered in support of the motion for preliminary injunction. See 7 J. Moore, *Federal Practice,* ¶65.04[3], at 65–60 n. 14 (2d ed. 1974).

### C. *INS Field Guidelines*

The plaintiffs submitted three documents which are operational manuals for INS agents in the field. The first document is a pamphlet entitled, "Authority of Immigration and Naturalization Service to Make Arrest." It was published in 1967, and defendant Giorgetti testified that all agents are familiar with its contents and rely on it daily.[12]

The second document is entitled, "Guidelines to a Constitutional Stop and Frisk," dated August 8, 1969, which is an appendix to an INS document entitled, "Immigration and Naturalization Service Investigators Handbook." The third document is an excerpt from the Handbook, and is dated November 26, 1971.

Unfortunately, no testimony was offered on the two Handbook excerpts, and as will be discussed later, the 1967 pamphlet which is still being used conflicts with guidelines in the Handbook. Therefore, no finding can be made other than agents are probably receiving misleading and conflicting documents from the Service regarding the scope of their authority.

### II. *Jurisdiction, Standing and the Plaintiff Class*

The defendants contend that this case requires the convening of a three-judge court pursuant to 28 U.S.C. § 2282 (1970), because the plaintiffs are attacking the constitutionality of 8 U.S.C. § 1357(a)(1), which provides:

§ 1357. *Powers of immigration officers and employees.—*

(a) Any officer or employee of the [INS] authorized under regulations prescribed by the Attorney General shall have power without warrant—

(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States; . . .

The defendants contend that this statute authorizes the INS to conduct operations of the nature complained of. Therefore

---

11. Palmisano tried unsuccessfully to contact the corporation's legal counsel to determine if he had to permit the agents to enter.

12. Tr. 138.

any challenge of the operations involves indirectly, if not directly, a challenge to the constitutionality of the statute. The plaintiffs maintain, however, that they are not challenging the constitutionality of this statute. Instead they challenge defendants' action under the statute which, plaintiffs assert, has transgressed the limits of the Fourth Amendment.

■ This case does not require the convening of a three-judge court. The conduct complained of is not so plainly required, directed or authorized by Section 1357(a)(1) as to call into question its constitutional validity. Nor are the plaintiffs seeking to enjoin the mere perfunctory application of the statute. *Sardino v. Federal Reserve Bank,* 361 F.2d 106, 115 (2d Cir.), *cert. denied,* 385 U.S. 898, 87 S.Ct. 203, 17 L.Ed.2d 130 (1966); *Woodward v. Rogers,* 344 F. Supp. 974, 978 (D.D.C.1972). *See Phillips v. United States,* 312 U.S. 246, 61 S.Ct. 480, 85 L.Ed. 800 (1941). The question is the scope of permissible action under the statute in light of and consistent with the Fourth Amendment. Here, as in *Almeida-Sanchez v. United States,* 413 U.S. 266, 272, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973), "It is clear . . . that no Act of Congress can authorize a violation of the Constitution. But under familiar principles of constitutional adjudication, our duty is to construe the statute, if possible, in a manner consistent with the Fourth Amendment." Furthermore, in light of the Court's most recent decision in *United States v. Brignoni-Ponce,* —— U.S. ——, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), which limits the exercise by INS agents of the authority granted by Section 1357(a)(1), this action now involves the application of that section as construed in *Brignoni-Ponce.*

■ Although not raised by defendants, consideration has been given to the question of jurisdiction under 28 U.S.C. § 1331 in light of *Giancana v. Johnson,* 335 F.2d 366 (7th Cir. 1964), *cert. den.* 379 U.S. 1001, 85 S.Ct. 718, 13 L.Ed.2d 702 (1965). Apart from the fact that the severity of *Giancana* has been ameliorated by *Gautreaux v. Romney,* 448 F.2d 731 (7th Cir. 1971) and *Calvin v. Conlisk,* 520 F.2d 1 (7th Cir. 1975), the complaint here specifically avers the requisite jurisdictional amount. Furthermore, the court finds that the equitable vindication of each individual plaintiff's Fourth Amendment rights is of a value to him or her in excess of $10,000 exclusive of interest and costs. As a consequence, jurisdiction of the subject matter is here under 28 U.S.C. § 1331.

An additional question of an Article III jurisdictional nature should be mentioned: the standing of Illinois Migrant Council to maintain the action in light of *Warth v. Seldin,* —— U.S. ——, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The parties have not addressed the question and its resolution is not necessary at this point in the proceedings in view of the fact that the individual plaintiffs clearly have standing to seek the relief which is here granted.

■ The question of class certification should be disposed of before addressing the merits of the pending motion. All of the requisites for class certification under Rule 23(b)(2) *Fed.R. Civ.P.* are present here. *Allee v. Medrano,* 416 U.S. 802, 94 S.Ct. 2191, 40 L. Ed.2d 566 (1974); *Lankford v. Gelston,* 364 F.2d 197 (4th Cir. 1967). Accordingly, the individual plaintiffs will represent a class consisting of all persons of Mexican ancestry or of a Spanish surname who are, will be or have been lawfully present in the Judicial District of Northern Illinois.

### III. *Conclusions of Law*

A. *The authority of INS agents to stop and interrogate persons under 8 U.S.C. § 1357(a)(1).*

As previously noted, 8 U.S.C. § 1357(a)(1) authorizes INS agents "without warrant—(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in

the United States . . .." Purportedly acting under this statutory grant of authority, agents of the INS stopped and interrogated Arturo Lopez, Larry Sandoval, Elias Montanez and Jose Angel Ortiz about their citizenship or their right to be or remain in the United States. From all that appears in the evidence, these persons, who are either citizens or legal residents of the United States, were singled out by the agents solely because they looked like Mexicans and hence "were believed to be . . . alien[s]" subject to interrogation under Section 1357(a)(1). The question is do these stops and interrogations square with the Fourth Amendment guarantee that the people shall be secure "in their persons . . . against unreasonable searches and seizures."

The starting point is *Almeida-Sanchez* in which the Court first encountered subsection (a)(3) of Section 1357 which provides that INS agents may, "within a reasonable distance from any external boundary of the United States, . . . board and search for aliens. . . . any . . . conveyance, or vehicle" without a warrant. Agents of the INS while on roving patrol some 25 miles from the Mexican border, stopped and searched defendant's automobile. Rather than aliens, they found and seized a large quantity of marijuana, which was used to convict defendant of the federal crime of unlawful importation. Defendant challenged the search, which was concededly made without a warrant, probable cause, reasonable suspicion, or consent. The Government sought to justify the search on the basis of subsection (a)(3), which had been implemented by an Attorney General's regulation defining "reasonable distance" as "within 100 air miles from any external boundary. . . ."

The Court first held that, because probable cause was lacking, the search could not be justified on the basis of any special rules applicable to automobile searches. *Carroll v. United States,*

267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1924); *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed. 419 (1970). Nor could the search be likened to an administrative inspection, *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); *Colonade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970); *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), because the INS agents had no warrant, no reason to believe that defendant had crossed the border or committed any offense, and defendant had not expressly, or by his activity impliedly, consented to the search.

The Court then turned to Section 1357(a)(3) with the view "to construe the statute, if possible, in a manner consistent with the Fourth Amendment." 413 U.S. at 272, 93 S.Ct. at 2539. It recognized that agents of the Government may, in enforcing the nation's immigration and custom laws, stop, interrogate and search persons and vehicles at the border or the functional equivalent thereof without regard to the limitations of the Fourth Amendment. But, held the Court, the search of defendant's automobile was of a wholly different sort and "[i]n the absence of probable cause or consent, that search violated the [defendant's] Fourth Amendment right to be free of 'unreasonable searches and seizures.'" 413 U.S. at 273, 93 S.Ct. at 2540.

The decision in *Almeida-Sanchez* was reinforced when the Court again considered the Section 1357(a)(3) search provision in *United States v. Ortiz,* —— U.S. ——, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975). There the warrantless search of defendant's car had occurred at a highway check point rather than on roving patrol. But the check point was not the functional equivalent of the border. The Court rejected the Government's assurance that INS agents "search only vehicles that arouse their suspicion" and its argument that "the officers should be free of judicial oversight of any

kind." —— U.S. at ——, 95 S.Ct. at 2588.

> "This degree of discretion to search private automobiles is not consistent with the Fourth Amendment. A search, even of an automobile, is a substantial invasion of privacy. To protect that privacy from official arbitrariness, the Court has always regarded probable cause as the minimum requirement for a lawful search . . . . We therefore follow [Almeida-Sanchez] and hold that at traffic check points removed from the border and its functional equivalents, officers may not search private vehicles without consent or probable cause." —— U.S. at ——, 95 S.Ct. at 2588.

■ Thus Almeida-Sanchez and Ortiz make clear that the authority to search vehicles granted to INS agents by Section 1357(a)(3) must be exercised in a manner and under circumstances compatible with the Fourth Amendment.

With the foregoing as a premise, it was not surprising that the Court read the Section 1357(a)(1) grant of authority to interrogate in a manner compatible with the Fourth Amendment when that provision was presented to it in United States v. Brignoni-Ponce, —— U.S. ——, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). There, agents of the INS on roving patrol pursued and stopped the defendant's car at a place which was not the functional equivalent of the border. The stop was made solely because "three occupants [of the car] appeared to be of Mexican descent." Id. at ——, 95 S.Ct. at 2577. The agents questioned the defendant and his two passengers about their citizenship and learned that the passengers were aliens who had entered the country illegally. All were arrested and the defendant charged with knowingly transporting illegal immigrants in violation of 8 U.S.C. § 1324(a)(2). At his trial, the defendant moved to suppress the testimony of and about his two passengers, claiming that the evidence was the fruit of the stop which, under the circum-

stances, was unreasonable and hence an unlawful seizure under the Fourth Amendment. The district court denied the motion. On appeal following conviction the Court of Appeals for the Ninth Circuit reversed. On certiorari the Supreme Court affirmed holding that the stop and interrogation violated the Fourth Amendment.

Before turning to the Court's decision in Brignoni-Ponce, the unanimous en banc opinion of the Ninth Circuit Court of Appeals in that same case, United States v. Brignoni-Ponce, 499 F.2d 1109 (1974), as well as certain decisions of other courts of appeal, deserve consideration.

In the court of appeals in Brignoni-Ponce, the Government argued that Almeida-Sanchez, which involved a search under Section 1357(a)(3), was not controlling because "[t]his case . . . involves merely a stop, pursuant to 8 U.S.C. § 1357(a)(1), for the purpose of interrogating a person believed to be an alien regarding his right to be in the United States." 499 F.2d at 1110. The Court of Appeals for the Tenth Circuit had accepted that argument in United States v. Bowman, 487 F.2d 1229 (10th Cir. 1973), where a stop of the defendant for "routine question[ing] concerning his citizenship" was approved although the INS agent had no stated grounds for the stop. The Tenth Circuit had held that Section 1357(a)(1) authorized the stop and interrogation and, "We . . . do not read [Almeida-Sanchez] as challenging the right of immigration officials to make routine inquiries as to an individual's nationality." 487 F.2d at 1231.

But the Ninth Circuit would have none of that. Noting that "[u]nder the Tenth Circuit's view, immigration officials could stop a vehicle anywhere in the country in order to interrogate its occupants as to their right to remain in the United States, without a warrant, without probable cause, and without even a reasonable suspicion that any of the occupants are illegal aliens," it con-

cluded that such stops would be "entirely inconsistent" with *Almeida-Sanchez.* 499 F.2d at 1108, 1111.

It noted that the Court of Appeals for the District of Columbia, in a series of cases discussed shortly, had held "that immigration officials, in accordance with § 1357(a)(1), may make forcible detentions of a temporary nature for the purposes of interrogation under circumstances creating a reasonable suspicion, not rising to the level of probable cause to arrest, that the individual so detained is illegally in this country." 499 F.2d at 1111.[13]

Pursuing that rationale the Ninth Circuit held that the INS agents who stopped the defendant's car "did not possess facts which constituted a founded suspicion that he or his passengers were illegal aliens. All they knew was that [defendant] and his companions appeared to be of Mexican descent and were in a sedan traveling north on Interstate 5, approximately 65 miles north of the Mexican border. This is not enough." 499 F.2d at 1112.

The decisions of the District of Columbia Court of Appeals to which reference has been made are *Yam Sang Kwai v. INS,* 133 U.S.App.D.C. 369, 411 F.2d 683 (1969), *Au Yi Lau v. INS,* 144 U.S. App.D.C. 147, 445 F.2d 217 (1971) and *Cheung Tin Wong v. INS,* 152 U.S.App. D.C. 66, 468 F.2d 1123 (1972). In this triology of cases that court has consid-

ered under varying circumstances the Section 1357(a)(1) authority of INS agents to stop and interrogate persons of apparent Chinese ancestry concerning their right to be in the United States in light of the Fourth Amendment and the Supreme Court's decisions in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L. Ed.2d 889 (1968) and *Adams v. Williams,* 404 U.S. 1014, 92 S.Ct. 670, 30 L. Ed.2d 661 (1972).[14] Without detailing the varying facts in those cases, suffice it here to say that the District of Columbia court has concluded that an INS agent who, on the basis of articulable facts reasonably believes a person to be an alien, may interrogate that person concerning his right to be in the United States, but that allowance "for mere questioning . . . assumes the individual's cooperation." *Au Yi Lau,* 445 F.2d at 222. On the other hand, if the agent has a reasonable suspicion based on articulable facts that the person is illegally in the United States, he may forcibly detain the person for a brief period for the purpose of interrogating him. *Id.* at 223. In either event, "the appearance of being oriental is [not] in any respect 'suspicious', and we wish to state in unequivocal terms that we could never condone stopping or questioning an individual simply because he looked to be of oriental descent." *Cheung Tin Wong,* 468 F.2d at 1127.[15]

This was the general state of the decisions [16] among the circuits regarding

13. Actually the Court of Appeals for the District of Columbia has fashioned two tests —one for "mere questioning" and the second for brief detentions. *See* text, *infra.*

14. Interestingly, in its en banc opinion in *Brignoni-Ponce* the Ninth Circuit made no mention of *Terry* and its progeny although it did rely, in part, upon its own earlier decision in *United States v. Mallides,* 473 F.2d 859 (9th Cir. 1973), which did rely on *Terry.* Similarly, in *United States v. Bowman,* 487 F.2d 1229 (10th Cir. 1973), the Tenth Circuit did not discuss or cite *Terry.* But see *United States v. Saldana,* 453 F.2d 352 (10th Cir. 1972), relying entirely on *Terry* with no mention of Section 1357(a)(1) to sustain an INS investigatory stop and questioning of "three occupants of Mexican de-

scent" in a vehicle 600 miles from the Mexican border.

15. In *Shu Fuk Sheung v. INS,* 476 F.2d 1180 (8th Cir., 1973), the petitioner was "detained temporarily for [an] interview" by INS agents during an area check of a Chinese restaurant where petitioner worked. He could not "satisfactorily substantiate his right to be in the United States." He was arrested and while in custody made statements used to deport him. In sustaining the interrogation the Eighth Circuit relied on the District of Columbia Circuit's "mere questioning" standard. 447 F.2d at 1181, 1182.

16. Two other decisions should be briefly noted. In *United States v. Cho Po Sun,* 409 F.2d 489 (2d Cir. 1969), the defendant was

INS interrogation stops under Section 1357(a)(1) when the Supreme Court rendered its decision in *Brignoni-Ponce* on June 30, 1975. At the outset the Court stated, "The *only* issue presented for decision is whether a roving patrol may stop a *vehicle* in an area near the border and question its occupants when the only ground for suspicion is that the occupants appear to be of Mexican ancestry." — U.S. at —, 95 S.Ct. at 2578. (Emphasis added.)

In the Supreme Court the Government claimed two sources of statutory authority for stopping vehicles without warrants in the border area. First was Section 1357(a)(1)'s grant of authority, without a warrant, "to interrogate any alien or person believed to be an alien" which the Government contended was met "at least in the areas adjacent to the Mexican border [where] a persons's apparent Mexican ancestry alone justified [the] belief that he or she is an alien. . . ." at —, —, 95 S.Ct. at 2578. Second, the Government contended, in light of Section 1357(a)(3)'s grant of authority to search vehicles for aliens without a warrant but within a reasonable distance from any external boundary, that INS agents have the "authority to stop moving vehicles and question the occupants about their citizenship, even when [the agents] have no reason to believe that the occupants are aliens or that other aliens may be concealed in the vehicle." *Id.* at —, 95 S.Ct. at 2578. Reminding that "no Act of Congress can authorize a violation of the Constitution," *Almeida-Sanchez* at 413 U.S. 272, 93 S.Ct. at 2539, the Court rejected both contentions.

It first made clear that the Fourth Amendment requirement of reasonableness applies to all seizures of the person, including those which involve only a brief detention. But, citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868 (1968), it stated that "The reasonableness of such seizures depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." *Id.* — U.S. at —, 95 S.Ct. at 2579. Noting the Government's "convincing demonstration" of the public need for effective enforcement of the Nation's immigration laws and the "modest" intrusion attendant the stop of an automobile and the questioning of its occupants, it concluded that "because of the limited nature of the intrusion, stops of this sort may be justified on facts, that do not amount to the probable cause required for arrest." *Id.* at —, 95 S.Ct. at 2580. Acknowledging that in *Terry* it had expressly declined to decide whether facts short of probable cause could justify an "investigative seizure" of a person, the Court pointed to its elaboration upon *Terry* in *Adams v. Williams*, 407 U.S. 143, 146, 92 S.Ct. 1921, 1923, 32 L.Ed.2d 612 (1972), that "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time."

As a consequence of the foregoing,

". . . we hold that when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in

---

prosecuted for assaulting an INS agent, engaged in the performance of his official duties, who sought to question the defendant about his citizenship. For the purposes of its decision affirming the conviction, the Second Circuit accepted defendant's contention that 8 U.S.C. § 1357(a)(1) required that the agent "reasonably" believe the person questioned to be an alien. 409 F.2d at 591.

In *Huerta-Cabrera v. INS*, 466 F.2d 759 (7th Cir. 1972), the Court of Appeals for this circuit, in reviewing a deportation proceeding, noted in passing "the constitutional ramifications of Section [1357(a)]. *See* Note, Temporary Detentions of Aliens for the Purpose of Interrogation are Subject to the Terry Doctrine, 72 Colum.L.Rev. 493 (1972)." 466 F.2d at 761 n. 4.

the country, he may stop the car briefly and investigate the circumstances that provoke suspicion. As in Terry, the stop and inquiry must be 'reasonably related in scope to the justification for their initiation.' . . . The officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause." —— U.S. at ——, 95 S.Ct. at 2580.[17]

Seeking to avoid even a "reasonable suspicion" requirement, the Government insisted that Congress could condition the admission of aliens to the country on their agreement to submit to reasonable questioning about their right to be and remain in the country. Assuming such to be the case, the Court pointed out that that power over aliens could not "diminish the Fourth Amendment rights of citizens who may be mistaken for aliens." It then proceeded immediately to say,

"For the same reasons that the Fourth Amendment forbids stopping vehicles at random to inquire if they are carrying aliens who are illegally in the country, it also forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens." Id. at ——, 95 S.Ct. at 2581.

The Court then reiterated its holding under the particular facts at hand:

"The effect of our decision is to limit exercise of the authority granted by both [Section 1357(a)(1) and (a)(3)]. Except at the border and its functional equivalents, officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with reasonable infer-

ences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country." Id. at ——, 95 S.Ct. at 2582.

At this point it inserted the following footnote:

"As noted above [18] we reserve the question whether [INS agents] may also stop persons reasonably believed to be aliens when there is no reason to believe they are illegally in the country. See Cheung Tin Wong v. INS, 152 U.S.App.D.C. 66, 468 F.2d 1123 (1972); An Yi Lau v. INS, 144 U.S. App.D.C. 147, 445 F.2d 217, cert. denied 404 U.S. 864 [, 92 S.Ct. 64, 30 L. Ed.2d 108] (1971). The facts of the case do not require decision on the point." Id. at ——, 95 S.Ct. at 2582.

The reason why the facts of the case did not require that decision was stated by the Court in the concluding paragraph of its opinion:

"In this case the officers relied on a single factor to justify stopping [the defendant's] car: the apparent Mexican ancestry of the occupants. We cannot conclude that this furnished reasonable grounds to believe that the three occupants were aliens. . . . Large numbers of native-born and naturalized citizens have the physical characteristics identified with Mexican ancestry, and even in the border area a relatively small proportion of them are aliens. The likelihood that any given person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor, but standing alone it does not justify stopping all Mexican-Americans to ask if they are aliens." Id. at ——, 95 S. Ct. at 2582.

Were this a criminal case or deportation proceeding (as all of the reported

---

17. Brignoni-Ponce marks the Court's first approval of a stop for the purpose of investigative interrogation on facts falling short of probable cause. Terry and its progeny involved limited searches for the protection of the officer.

18. Referring, presumably to its opening statement that the only issue presented was vehicular stops. Id. at ——, 95 S.Ct. 2574.

cases in this area have been), the decisional process would be completed. Any evidence—tangible or testimonial (but see, *Brignoni-Ponce, supra,* at ——, n. 2, 95 S.Ct. at 2577)—derived from the obviously unlawful stops of Lopez, Sandoval, Montanez and Ortiz, would be ordered suppressed. But this is not a criminal case or deportation proceeding in which retrospective examination is made of alleged official misconduct and in which the imperfect and frustrating but nonetheless limited remedy of suppression is invoked. Here plaintiffs seek to have defendants enjoined from committing future transgressions. Thus it will not suffice to rule that the defendants should not have done that which they did. If plaintiffs are to receive the relief they seek, and to which they are entitled, the standards under which defendants may perform their official duties in the future must be defined. And this is particularly so in light of the importance of defendants' work: the enforcement of the Nation's immigration laws and the protection of the Nation and its economy from the consequences of illegal immigration. *See Brignoni-Ponce, supra,* at —— – ——, 95 S.Ct. 2590, at 2591–2597 (Burger, Ch. J., concurring, Appendix).

■ While this definitional task has been simplified to a degree by the previously discussed decisions of the Supreme Court and the several courts of appeal, none of those decisions involved circumstances identical to those presented here. It is clear from *Brignoni-Ponce,* however, that INS agents cannot stop a vehicle near the border merely because it is occupied by persons of apparent Mexican ancestry; the agents must reasonably suspect, on the basis of specific articulable facts, that the vehicle contains an alien illegally in the country. *A fortiori,* INS agents cannot stop a vehicle in the Northern District of Illinois merely because its occupants appear to be of Mexican ancestry, as was done in the incident involving Sandoval and Montanez. Here, too, the agents must reasonably suspect that the vehicle contains illegal aliens.

But what of persons afoot such as Lopez and Ortiz? Under what circumstances may they be stopped and interrogated regarding their citizenship? Obviously the agent must reasonably suspect that the person accosted is an alien, because only an alien can be illegally in the country. But is suspicion of alienage enough, or must the suspicion go further to include that the alien is illegally in the country? This question was specifically reserved by the Court in *Brignoni-Ponce* (at ——, fn. 9, 95 S.Ct. at 2582), while it recognized the double standard that has been fashioned by the District of Columbia Court of Appeals.

■ While private vehicular transportation has become an essential part of our freedom to travel domestically, it would be anomalous to guarantee the automobile driver greater freedom of movement than that afforded the pedestrian.[19] Indeed, to the extent that differing Fourth Amendment standards have developed among persons, places and vehicles, the less stringent have been applied to vehicles because of the exigent circumstances inherent in their operation. *See Carroll v. United States, supra; Chambers v. Maroney, supra.* Therefore, if, as *Brignoni-Ponce* holds, a vehicle cannot be stopped unless the agent reasonably suspects that it contains aliens illegally in the country, a person should not be stopped unless the agent reasonably suspects that he or she is an alien illegally in the country.

With all respect, the formulae developed by the District of Columbia Court of Appeals are not realistic or conducive

---

19. *Compare, United States v. Mallides,* 473 F.2d 859, 861 (9th Cir. 1973), where, in concluding that an automobile driver is entitled to the same Fourth Amendment protection as a pedestrian under *Terry v. Ohio,* the court said: "Although a pedestrian and an automobile driver are not in identical circumstances, we see no reason why similar Fourth Amendment standards should not be applied in both situations."

to the preservation of Fourth Amendment rights. As previously observed, that court would draw a distinction between "mere questioning" which proceeds on the basis of "the individual's cooperation" (*Au Yi Lau, supra*, at 222) and "forcible detentions of a temporary nature for the purposes of interrogation." *Id*. at 223. For "mere questioning" the INS agent must reasonably believe that the person interrogated is "of alien origin." *Id*. at 222. For "forcible detention" the INS agent must reasonably suspect that the person detained is "illegally in this country." *Id*. at 223.

The line between mere questioning and forcible detention is faint and too easily crossed.[20] Any agent worthy of the calling expects cooperation and knows how to get it. Implicit in the introduction of the agent and the initial questioning is a show of authority to which the average person encountered will feel obliged to stop and respond. Few will feel that they can walk away or refuse to answer. And if they should, Larry Sandoval's experience teaches the consequences. He was grabbed and placed in the agents' car to be taken "to Chicago." True, when he asserted his citizenship the agents desisted, but by that time the "modest" intrusion approved by the Court in *Brignoni-Ponce* had escalated to a substantial physical contact of a threatening nature solely because Sandoval looked like a Mexican.

The only standard which is workable and responsive to the command of the Fourth Amendment is that an INS agent must reasonably suspect on the basis of specific articulable facts and reasonable inferences drawn therefrom that a person is an alien illegally in the country before the agent may stop and interrogate that person pursuant to the authority of Section 1357(a)(1).

While a list of articulable facts might appear helpful, it would ultimately prove too restrictive. The variety of street encounters that INS agents have with members of the public is diverse. The expertise which the agents develop through their specialized branch of law enforcement is substantial. It is better, even in the face of the injunctive relief that is granted here, that the agents be free to engage in on-the-spot assessments of the totality of the circumstances which they observe and about which they are reliably informed. *See Adams v. Williams, supra*.

Nevertheless, it is not amiss to observe that while apparent Mexican ancestry is not enough to support a reasonable suspicion that the person is either an alien or illegally in the country, it is a relevant circumstance which can be taken into account along with dress, hairstyle and speech. Furtive conduct and flight, particularly when the person in question has become aware of an agent's identity and presence, may justify suspicion as may a person's failure to produce evidence of his identification when it is requested by another.

The purpose of all this is to recognize the applicability of the Fourth Amendment to the important work which INS agents do in the field. They, like all federal officers, are committed to the Constitution and have taken an oath to support it. With the guidance that this decision hopefully provides, they will discharge their duties in a manner compatible with the Fourth Amendment.

B. *Area Control Operations and the Warrantless Searches Attendant Them.*

The warrantless entries and searches of homes, dormitories, cottages and plants by INS agents during the area control operations in Rochelle and Mendota are far easier to resolve than the street encounters. The Government concedes that no warrants had issued and that probable cause did not exist.

---

20. *See Shu Fuk Cheung v. INS*, 476 F.2d 1180 (8th Cir. 1973), cited *supra* in n. 15, where the court applied the mere questioning standard in approving a detained questioning.

Nor does 8 U.S.C. § 1357 purport to authorize these incursions which in the cases of the dormitories, cottages and homes were particularly egregious.[21] Rather, the Government asserts that all of the entries were made with the consent of the occupants.

If a search. is made pursuant to valid consent, no claim can be made that it violated the Fourth Amendment rights of the occupants of the premises. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). But when the Government seeks to justify a search on the basis of consent it has the burden of establishing that the consent was freely and voluntarily given. *Bumper v. North Carolina,* 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L. Ed.2d 797 (1968). This standard was examined and elaborated upon by the Supreme Court in *Schneckloth v. Bustamonte, supra,* in which it said:

> " . . . the Fourth and Fourteenth Amendments require that [the Government] demonstrate that the consent was in fact voluntarily given and not the result of duress or coercion, express or implied. Voluntariness is a question of fact to be determined from all the circumstances . . . ." 412 U.S. at 248–49, 93 S.Ct. at 2059.

It would be hypocrisy of the lowest order to hold that the knocks on the doors of the Del Monte dormitories and cottages and the Solis residence produced consent "voluntarily given and not the result of duress or coercion." *Id.* To be true to the Fourth Amendment, these invasions of home and privacy in the dark of the early morning must be sternly rebuked.[22]

The entries into the Del Monte plants at Rochelle and the Motor Wheel

plant at Mendota present different considerations. In the first place, the consent to enter, while given in response to a show of authority cannot be said to have been involuntary. But the argument over consent in which the parties have engaged is misplaced. The Fourth Amendment confers rights which cannot be asserted vicariously. *Alderman v. United States,* 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). Therefore, these plaintiffs cannot assert the rights of Del Monte or Motor Wheel to be free from unreasonable searches and seizures or harassment by the INS.

The plaintiffs do, however, have standing to complain of what happened to them and the members of their class after the INS agents entered the plants. Here the evidence shows that the plant workers of apparent Mexican ancestry were systematically interrogated regarding their citizenship. Stopping and questioning in a plant setting is no different from stopping and questioning on the street. Here, too, an INS agent must reasonably suspect on the basis of specific articulable facts and reasonable inferences drawn therefrom that a person is an alien illegally in the country before the agent may stop and interrogate that person pursuant to the authority of Section 1357(a)(1).

## C. *A Preliminary Injunction is the Appropriate Remedy*

A preliminary injunction is a remedy which should be granted only when the facts clearly warrant its issuance and then, only in the exercise of sound discretion. *General Electric Co. v. American Wholesale Co.,* 235 F.2d 606, 608 (7th Cir. 1956). When those tests are met, police misconduct can be preliminarily enjoined. *Allee v. Med-*

---

21. Section 1357(a)(3) authorizes INS agents under regulations prescribed by the Attorney General, "without warrant . . . within a reasonable distance from any external boundary . . . to have access to private lands, *but not dwellings,* for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States . . . ." (Emphasis added.)

22. The plaintiffs allege that the same pattern of entries into dwellings occurred in Mendota. Thus far no evidence has been adduced on that allegation.

*rano,* 416 U.S. 802, 94 S.Ct. 2191, 40 L. Ed.2d 566 (1974); *Hague v. C. I. O.,* 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939); *Washington Free Community, Inc. v. Wilson,* 157 U.S.App.D.C. 360, 484 F.2d 1078 (1973); *Lankford v. Gelston,* 364 F.2d 197 (4th Cir. 1967); *Schnell v. City of Chicago,* 407 F.2d 1084 (7th Cir. 1969); *Wilkins v. Alioto,* No. 74 C 0866–ACW (N.D.Cal., Apr. 25, 1974; Note, "Federal Injunction as a Remedy for Unconstitutional Police Conduct," 78 Yale L.Rev. 143 (1968).

A party seeking a preliminary injunction must satisfy four requirements: First, the movant must establish a reasonable probability that it will succeed on the merits. Absent this showing, there is no reason for a court to depart from the orderly process of judicial decision. Second, the movant must establish that it will suffer irreparable injury for which there is no adequate remedy at law if the preliminary injunction is denied. Third, the movant must show that others will not suffer serious adverse effects as a consequence of the preliminary injuction. And fourth, the court must weigh the effects of the requested order on the public interest, this requirement being of special importance when alleged police misconduct is the subject matter of the controversy. *See North Avondale Neighborhood Association v. Cincinnati Metropolitan Housing Authority,* 464 F.2d 486, 488 (6th Cir. 1972); *Tele-Controls, Inc. v. Ford Industries, Inc.,* 388 F.2d 48, 50 (7th Cir. 1967); *Virginia Petroleum Jobbers Association v. Federal Power Commission,* 204 U.S.App.D.C. 106, 259 F.2d 921, 925 (1958); *Doeskin Products v. United Paper Co.,* 195 F.2d 356, 359 (7th Cir. 1962); *Northwest Industries v. B. F. Goodrich Co.,* 301 F.Supp. 706 (N.D.Ill. 1969).

All of these requirements have been met to the end that a preliminary injunction should issue.

The oral testimony, depositions, and exhibits are persuasive that the plaintiffs have a substantial likelihood of success on the merits on the issue of warrantless searches of dwellings. The plaintiffs established that dormitories, cottages and homes in Rochelle were entered by INS agents during the predawn hours without warrants or probable cause. At this stage of the proceeding the defendants' defense of consent is overwhelmingly contradicted by the evidence. Applying the standards announced in *Schneckloth,* the Government has, thus far, failed in its burden of establishing that consent to the entries was given freely and voluntarily without threat or coercion. Weighing the evidence of the Rochelle raids, the plaintiffs have, at a minimum, shown a strong probability of success on the merits that warrantless entries were made at Rochelle without consent.[23]

Insofar as the vehicle, street and plant stops and questioning are concerned, there is virtually no dispute on the facts. The plaintiffs and members of their class have been stopped and interrogated solely because they appeared to be of Mexican ancestry. As in *Almeida-Sanchez, Ortiz* and *Brignoni-Ponce,* the defendants urge that this investigative technique is authorized by Section 1357(a)(1) and is necessary to the effective enforcement of the Nation's immigration laws. Those arguments have been rejected here in large measure because they have been rejected by the Supreme Court. Thus, the issue of stop and questioning is in all essential respects one of law upon which the plaintiffs have prevailed.

However, in deciding whether the plaintiffs have established a reasonable probability of success on the merits, the inquiry does not end when the movant shows that specific instances of misconduct have occurred in the past. The plaintiff must also establish a reason-

23. As noted previously, no evidence has been adduced to date on the plaintiffs' allegations that a similar pattern of dwelling entries was pursued by the defendants in Mendota.

able probability that the conduct was part of an official policy to the end that there is a substantial likelihood that future violations will occur. *Long v. District of Columbia,* 152 U.S.App.D.C. 187, 469 F.2d 927, 932 (1972); *Washington Free Community Inc. v. Wilson,* 157 U. S.App.D.C. 360, 484 F.2d 1078, 1081 (1973). *See Allee v. Medrano,* 416 U.S. 802, 94 S.Ct. 2191 (1974).

 In determining whether there exists an official policy of authorizing conduct inconsistent with the Fourth Amendment, one permissible source of evidence is administrative guidelines provided agents of the INS. *See Long v. District of Columbia, supra,* at 930. These guidelines are not necessarily conclusive even if they are compatible with the Constitution, since it is possible that despite the guidelines, agents will continually carry out unlawful stops and interrogations and entries into dwellings.

The plaintiffs have submitted three pieces of documentary evidence which provide some insight into INS policies. The first document, a pamphlet entitled, "Authority of Immigration and Naturalization Service to Make Arrests," (M–69, Rev. May 1967), is sorely lacking in appropriate guidelines for agents. The section dealing with an agent's power under Section 1357(a)(1) was written before *Terry v. Ohio, supra,* was decided, and leaves the reader with the impression that agents may accost any person believed to be an alien and conduct an interrogation as to that person's citizenship. Considering the previous discussion of Section 1357(a)(1), the document fails to provide adequate guidelines for agents. Similar, but less flagrant examples of misleading and inadequate information are found in the section entitled, "Entries into private dwellings." That section was written before *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), and leaves the impression that commercial premises are not subject to the warrant requirement. *Go-Bart Co. v. United States,* 282 U.S. 344, 357, 51

S.Ct. 153, 75 L.Ed. 374 (1931). *See generally, Katz v. United States, supra,* at 351–52, 88 S.Ct. 507.

The deficiencies of the pamplet are somewhat mitigated by an INS publication entitled, "Immigration and Naturalization Investigators Handbook." An appendix to the Handbook, entitled, "Guide-Lines to a Constitutional Stop and Frisk," dated August 8, 1969, contains an apparent attempt by the Service to formulate standards for street encounters consistent with *Terry v. Ohio, supra.* The guidelines provide:

"The following guidelines are designed to help you pass the test in the stop and frisk situation. Remember your contact with the public ranges from voluntary conversations to deadly confrontations. These Guidelines are directed *at only one level of police contact* with the public. They do not apply when you merely talk to a person so long as he knows he is free to go. They also do not apply when you are stopping an individual in order to make an arrest. *They apply only in situations where you do detain an individual but do not have probable cause to arrest him.* These Guidelines are not to be read technically, rather, read them with the common sense that must guide all "on the beat" action. Do not attempt to correct an illegal stop or frisk by retrospectively trying to fit them. Follow them initially before and during the stop and save yourself embarrassment later.

"A. Guidelines for a Reasonable Stop.

"1. You do *not* need probable cause to make a stop.

"2. You do *not* have to rely only upon the visible activity of a person. You may consider the area, the time of day, the knowledge you may have of the person, hearsay information or any other facts you may have. *If all the circumstances indicate that you have reasonable grounds to suspect the individual has committed, is com-*

*mitting, or is about to commit a crime, stop him.* If you do not have such grounds, continue your surveillance until you do, or drop the matter as the circumstances warrant.

"3. The Court is not interested in your gut reaction, they will want to have the *specific* facts and your inferences therefrom. Take note of them as soon as circumstances permit, while they're fresh in your mind: If you can't verbalize them, you probably didn't have grounds for a legal stop anyway, even if your 'hunch' was right. (In short, ask yourself why did I believe I could stop and/or frisk him.)"

Thus, the INS has issued some directives regarding street encounters which, while not specific in the sense of spelling out the type of facts necessary to make a stop, do establish a recognition by the Service that the standards of *Terry v. Ohio, supra,* are applicable to agents. Unfortunately, the guidelines make no reference to Section 1357(a)(1), or the 1967 document referred to earlier. The failure to make such a reference could easily lead to confusion for field offices.

The plaintiff submitted another excerpt from the Handbook. This excerpt, dated November 26, 1971, provides:

"While section 287 [i.e., 1357] authorizes immigration officers to interrogate, without warrant, any alien or person believed to be an alien regarding his right to be or remain in the United States, this authority is not license to interrogate persons indiscriminately or on a wholesale basis. The investigator must bear in mind that he should have what a reasonable person would consider 'reason to believe' that the person he proposes to interrogate is an alien. Prompt identification of himself as an immigration officer is as basic as a demonstrable respect for the rights and sensitivities of the person being interrogated."

On the basis of this directive, it appears that the INS recognizes that indiscriminate and wholesale stops and interrogations are not permitted. But the directive does not comport with the conclusions reached here that advise agents that a stop and interrogation must be based on a reasonable suspicion that the person in question is an alien illegally in the country, nor does it advise agents that they do not have reason to believe individuals are aliens merely because of their race or dress. Moreover, from the evidence presented, it is impossible to determine whether the 1967 or 1971 publication is being used by the INS. Furthermore, the evidence shows that these guidelines are not being followed by the officers in the field and the plaintiffs have established a reasonable probability that the misconduct is widespread and not the result of isolated transgressions by a few agents. Thus, even if the written policy were constitutionally adequate, the course of conduct in the field has been impermissible.

The plaintiffs have also established that there is a substantial likelihood that the illegal course of conduct will continue in the future. Defendant Giorgetti, who was in charge of the Mendota and Rochelle raids, is also in charge of area control operations in the Chicago area. These area control operations are continuing on a daily basis. Consequently, the plaintiffs have sufficiently met their burden of establishing the likelihood of future illegal conduct despite the written policy of the INS. *Long v. District of Columbia,* 152 U.S. App.D.C. 187, 469 F.2d 927, 932 (1972); *Washington Free Community, Inc. v. Wilson,* 157 U.S.App.D.C. 360, 484 F.2d 1078 (1972). *See Rawley v. McMillan,* 502 F.2d 1326, 1334 (4th Cir. 1974); *Lankford v. Gelston,* 364 F.2d 197 (4th Cir. 1966).

In summary, the plaintiffs have established a reasonable probability of success on the merits of their claims of unlawful conduct by INS agents. They

have also established that despite a written policy which arguably attempts to conform to Fourth Amendment requirements, agents have by their course of conduct, pursued policies of unlawful conduct, and that there is a substantial probability that this conduct will occur in the future.

The second requirement the plaintiffs must meet before a preliminary injunction will issue is that they will suffer irreparable injury if an injunction is not issued. There is no dispute that a violation of an individual's rights under the Fourth Amendment is a serious injury. And this is especially so in a case such as this when agents are accused of entering dwellings in pre-dawn hours without warrant or probable cause and interrogating individuals. The defendants claim, however, that the injury is not irreparable, relying on 28 U.S.C. § 2680(d) (March 16, 1974), *Bivens v. Six Unknown Agents*, 403 U.S. 388, 91 S.Ct. 1999 (1971), and *Triteis v. Backer*, 501 F.2d 1021 (7th Cir. 1974). Despite the possibility of recovering damages, a remedy the plaintiffs do not seek, money damages are not an adequate remedy at law when a pattern of unconstitutional deprivation of rights is established. *Schnell v. City of Chicago*, 407 F.2d 1084, 1986 (7th Cir. 1969); *Lankford v. Gelston*, 364 F.2d 197, 200 (4th Cir. 1966); 11 C. Wright & A. Miller, *Federal Practice & Procedure*, § 2948, at 440 n. 39 (1973). The plaintiffs have met the second requirement.

The plaintiffs have also met the third requirement. There is no evidence that anyone else will suffer any adverse effect as a consequence of the preliminary injunction. The defendants are merely being ordered to conform their conduct to the requirements of the Fourth Amendment. Clearly this cannot be an injury to them or the public.

The final requirement is that the court make a determination of where the public interest lies. In any case in which the courts are asked to interject

themselves into the field of police-community relations, sensitive nerves are touched. As Judge Wright said in his concurring opinion in *Long*:

"Injunctive relief against Fourth Amendment violations is appropriate upon proof that such violations have occurred repeatedly and may well continue. *See Lankford v. Gelston*, 364 F.2d 197 (4th Cir. 1966); *Gomez v. Wilson*, 323 F.Supp. 87 (D.D.C.1971). The security of our citizens from official lawlessness, with its corrosive effect on private citizens' self-discipline and respect for government, demands no less. But such relief must not be granted lightly, for unduly obtrusive or hasty judicial intervention can undermine the important values of police self-restraint and self-respect. 469 F.2d at 934.

The public interest demands that the immigration laws be enforced, and enforced vigorously. Unquestionably, this is a difficult task. But the difficulty of the task does not justify unlawful conduct by government agents. In *Almeida-Sanchez v. United States*, Justice Stewart responded to the argument of need as follows:

"It is not enough to argue, as does the Government, that the problem of deterring unlawful entry by aliens across long expanses of national boundaries is a serious one. The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards. It is well to recall the words of Mr. Justice Jackson, soon after his return from the Nuremburg Trials:

" 'These [Fourth Amendment rights], I protest, are not mere second-class rights but belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the indi-

vidual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government.' "

413 U.S. at 273–74, 93 S.Ct. at 2540. The public interest requires both enforcement of the immigration laws and adherence to the Fourth Amendment. The public interest also requires the issuance of the requested injunction.

For the foregoing reasons a preliminary injunction order will issue without bond. The cause is set for completion of the trial on the merits on Monday, October 9, 1975 at 9:00 a. m.