ILLINOIS MIGRANT COUNCIL, a not-for-profit corporation, individually, and Arturo Lopez, Larry Sandoval, Elias Montanez, Tessie Alvarado, Isabel Carillo, Fidencio Salinas, Rutilio Arteago, and Ninfa Anteago, individually and on behalf of all others similarly situated, Plaintiffs,

v.

Alva L. PILLIOD, individually and in his official capacity; William Bartley, individually and in his official capacity; Robert Germain, individually and in his official capacity; Tom Allen, individually and in his official capacity; Charles Partin, individually and in his official capacity; Wallace Gray, individually and in his official capacity; Todore Georgetti, individually and in his official capacity; and Richard Roe, individually and in his official capacity, and 35 unknown agents of the Immigration and Naturalization Service, individually and in their official capacity, Defendants.

ILLINOIS MIGRANT COUNCIL, a not-for-profit corporation, individually and Jesus Ayala, Salvador Torres, and Daniel Medina Raya, individually and on behalf of all others similarly situated,

v.

David VANDERSALL, District Director Immigration and Naturalization Service; Thomas Grady, Assistant District Director for Investigation, Immigration and Naturalization Service; Edward Kalis, Investigator, Immigration and Naturalization Service; Theodore Georgetti, Investigator, Immigration and Naturalization Service, five more unknown agents of the Immigration and Naturalization Service; Earl Wendt, Mayor, City of Moline; Nial Hogeboon, Chief of Police, Moline Police Department; David Millet, Acting Chief of Police and Captain, Moline Police Department; all individually and in their official capacities, Defendants.

Nos. 74 C 3111, 75 C 3541.

United States District Court, N.D. Illinois, E.D.

Sept. 21, 1987.

## MEMORANDUM OPINION AND ORDER

PRENTICE H. MARSHALL, District Judge.

Some thirteen years of often hotly contested litigation are drawing to a close. Before us are plaintiffs' motion for attorneys' fees and costs in 74 C 3111 and the federal defendants' motion for costs in 75 C 3541.

## TIMELINESS OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES

The final order dismissing this action stated: "The question[s] of costs and attorneys fees are reserved for resolution upon application by the parties within ten days hereof." *Illinois Migrant Council v. Pilliod,* No. 74 C 3111, and *Illinois Migrant Council v. Vandersall,* No. 75 C 3541 (N.D.Ill. Feb. 11, 1985), Final Order at ¶ 4. On plaintiffs' motion, we amended paragraph 4 to read as follows:

> The question of costs is reserved for resolution upon application by the parties within 30 days of the date of the Final Order (February 11, 1985), pursuant to Local Rule 45 of the General Rules for the Northern District of Illinois. The question of attorney's fees is reserved for resolution upon application by the parties pursuant to the provisions of the Equal Access to Justice Act, 28 U.S.C. § 2412.

*Illinois Migrant Council v. Pilliod,* No. 74 C 3111, and *Illinois Migrant Council v. Vandersall,* No. 75 C 3541 (N.D.Ill. Feb. 22, 1985). The Equal Access to Justice Act requires that a party seeking attorney's fees and other expenses file his application "within thirty days of final judgment in the action." 28 U.S.C.A. § 2412(d)(1)(B) (West Supp.1987). Plaintiffs' motion for attorneys' fees was filed on March 27, 1985. Defendants urge that the motion is not timely.

Until 1985, there had been a conflict among circuits as to what constitutes a "final judgment" for purposes of the Equal Access to Justice Act. The Seventh Circuit held in *McDonald v. Schweiker,* 726 F.2d 311, 315 (7th Cir.1983), that an application filed more than thirty days after the district court's judgment but within thirty days after dismissal of the government's appeal was timely. *Accord Massachusetts Union of Public Housing Tenants v. Pierce,* 755 F.2d 177, 180 (D.C.Cir.1985) (per curiam). *Contra McQuiston v. Marsh,* 707 F.2d 1082, 1085 (9th Cir.1983). *But cf. Monark Boat Co. v. N.L.R.B.,* 708 F.2d 1322, 1327–28 (8th Cir.1983) (Application for fees awarded by an agency under 5 U.S.C. § 504).

Congress resolved this conflict by amending the definition of "final judgment" to mean "a judgment that is final and not appealable, and includes an order of settlement." 28 U.S.C.A. § 2412(d)(2)(G) (West Supp.1987). The legislative history to this amendment makes clear that Congress adopted the *McDonald* treatment of the words "final judgment." As the Judiciary Committee's report explained,

> If a settlement is reached and the fee award is not part of the settlement, then the thirty-day period would commence on the date when the proceeding is dismissed pursuant to the settlement or when the adjudicative officer approves the settlement.

> Thus, if the Government does not appeal an adverse decision, the thirty-day period would begin to run upon expiration of the time for filing the notice of appeal or a petition for certiorari. Thus appealable orders include all discretionary appeals and include writs of certiorari. . . .

H.R.Rep. No. 99–120, Part I, 99th Cong., 1st Sess. 18 n. 26, *reprinted* in 1985 U.S. Code Cong. & Ad. News pp. 132, 146.

While they have suggested that the dismissal was not a decision adverse to them,

defendants have not argued that our order of February 11, 1985 was not an appealable order or that it represented a settlement so that plaintiffs' time to file the request for fees began to run on that date. Under the 1985 amendment to the Equal Access to Justice Act, plaintiffs' time to file their application for fees began to run upon the expiration of defendants' time for filing a notice of appeal.[1] Plaintiffs' application is timely.

## PLAINTIFFS' MOTION FOR ATTORNEYS' FEES

Under the Equal Access to Justice Act, we may award fees to a party who prevails against the United States unless we find that the position of the United States was substantially justified or that special circumstances make an award unjust.[2] 28 U.S.C.A. § 2412(d)(1)(A) (West Supp.1987).

*Prevailing Party*

The Equal Access to Justice Act does not define "prevailing party." The Supreme Court in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), approved a generous formulation of the prevailing party standard. "[P]laintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Id.* at 433, 103 S.Ct. at 1939, *quoting Nadeau v. Helgemoe*, 581 F.2d 275, 278–79 (1st Cir.1978).

■ Plaintiffs can establish that they are "prevailing parties" without having received a final judgment in their favor. *Environmental Defense Fund, Inc. v. Environmental Protection Agency*, 716 F.2d 915, 919 (D.C.Cir.1983) (per curiam) (joint motion to dismiss). *Maher v. Gagne*, 448 U.S. 122, 129, 100 S.Ct. 2570, 2575, 65 L.Ed.2d 653 (1980) (settlement); *Ortiz de Arroyo v. Barcelo*, 765 F.2d 275 (1st Cir.1985) (voluntary dismissal); and *Hennigan v. Ouachita Parish School Board*, 749 F.2d 1148 (5th Cir.1985) (case dismissed as moot). Neither *Hewitt v. Helms*, —— U.S. ——, 107 S.Ct. 2672, 96 L.Ed.2d 654 (1987), nor *Palmer v. City of Chicago*, 806 F.2d 1316 (7th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 2180, 95 L.Ed.2d 836 (1987), which have been decided since the briefs in this matter were completed, detracts from this premise.

■ Although plaintiffs voluntarily dismissed this action rather than settling it, the settled case test for a prevailing party of *Illinois Welfare Rights Organization v. Miller*, 723 F.2d 564 (7th Cir.1983) is appropriate here.

The test for whether a plaintiff is a prevailing party in a settled case is two-fold. First, "the plaintiff['s] lawsuit must be causally linked to the achievement of the relief obtained," and second, "the defendant must not have acted wholly gratuitously, *i.e.*, the plaintiff['s] claim[ ], if pressed, cannot have been frivolous, unreasonable, or groundless."

*Id.* at 566 (citations omitted).

*Illinois Welfare* instructs us to look at the complaint as the best source of plaintiffs' objective in bringing the action. 723 F.2d at 569. Here plaintiffs sought both declaratory and injunctive relief. First, plaintiffs asked that this court

---

1. Section 7(a) of Public Law 99–80, the amendment to the Equal Access to Justice Act, specifically provided that the amendments to section 2412(d) of Title 28 "shall apply to cases pending on or commenced on or after the date of the enactment of this Act [Aug. 5, 1985]." Note foll. 5 U.S.C.A. § 504 (West Supp.1987). "The phrase 'cases pending' makes no distinction between the fee application stage of a case and considerations of the merits. On its face, therefore, the statute applies to fee applications pending on the date of the enactment." *Russell v. National Mediation Board*, 775 F.2d 1284, 1286 (5th Cir. 1985). Plaintiffs' fee application and this action were pending on August 5, 1985.

2. The Act also contains an "eligibility" requirement. "Party" is limited to individuals whose net worth did not exceed $2 million and any corporation, the net worth of which did not exceed $7 million, and which had not more than 500 employees at the time the action was filed. 28 U.S.C.A. § 2412(d)(2)(B) (West Supp.1987). Plaintiffs have demonstrated their eligibility to receive an award of fees under the Act. Supplement to Plaintiffs' Application for Attorneys' Fees, filed May 22, 1986.

Declare that Defendants' conduct in engaging in a pattern and practice of illegal entries, mass interrogations, dragnet detentions, and groundless arrests as described in the Complaint herein is in violation of the provisions of 8 U.S.C. § 1357, limiting the power of INS agents, and in violation of Plaintiffs' rights under the First, Fourth, Fifth, Sixth, and Ninth Amendments to the Constitution.

Complaint, Prayer for Relief, ¶ 2. Plaintiffs also sought "preliminary and final injunctions enjoining the Defendants from engaging in entries into dwellings without search warrants and in interrogations, detentions, searches and arrests of individuals or groups of individuals when Defendants do not have probable cause to believe that such individuals or groups of individuals are aliens illegally present within the United States." *Id.*, ¶ 3.

Plaintiffs assert that a change in Immigration and Naturalization Service (INS) policy with regard to certain of defendants' practices was achieved as a direct result of this action.[3] This change in policy concerning the warrantless entry into dwellings and detentions was one of the stated reasons for plaintiffs' voluntary dismissal of this action.

Defendants do not concur.[4] First they read the prayer for relief literally and argue that revision of INS policy was not a stated objective of plaintiffs' complaint. Next, they assert that INS policy has not substantially changed and that there was no causal connection between plaintiffs' lawsuit and the alleged INS policy changes.

The parties focus on written INS policy, but that approach may not provide complete analysis. What relief was obtained by plaintiffs can best be assessed by comparing defendants' practices (which may or may not coincide with written INS policy) at the time the action was filed to those practices at the time of plaintiffs' dismissal of this action.

Plaintiffs complained of two instances in September and October 1974 where individuals were stopped by INS agents and interrogated as to their lawful presence in the United States, Complaint, ¶¶ 22–25. In one incident, the INS agents followed the car in which plaintiffs were riding. And in the second, the agents approached a pedestrian. The details of these encounters are set forth in our decision on plaintiffs' application for preliminary injunction. *Illinois Migrant Council v. Pilliod*, 398 F.Supp. 882, 887–88 (N.D.Ill.1975) (*Illinois Migrant Council I*) (*aff'd.*, 540 F.2d 1062 (1976), 548 F.2d 715 (7th Cir.1977)). We found that these individuals "were singled out because they looked like Mexicans and hence 'were believed to be ... alien[s]' subject to interrogation." 398 F.Supp. at 893.

The 1967 operations manual did not directly address the authority of INS field agents to stop vehicles in situations other than border searches, check points, and the transportation of illegal aliens "Authority of Officers of the Immigration and Naturalization Service to Make Arrests, M–69," at 5 (digest issued by U.S. Department of Justice, Immigration and Naturalization Service, Washington, D.C., Rev. May, 1967) (1967 INS guidelines). With regard to the interrogation of individuals, the guidelines state:

> *Questioning persons.* An immigration officer has the power without warrant to question any alien or person be-

---

3. Plaintiffs have excluded from their fee request all time spent on two matters in which they did not prevail; their motions for rules to show cause and contempt judgments based on defendants' alleged non-compliance with the preliminary injunction and their motion for summary judgment filed on September 26, 1980.

4. Defendants are quick to point out that at the conclusion of this action plaintiffs had little relief "in hand." Our order of February 11, 1985 (1) dissolved the preliminary injunction as modified; (2) vacated the grant of partial summary judgment in plaintiffs' favor and all other interlocutory orders; and (3) dismissed the action without prejudice on the condition that plaintiffs not refile their claims for injunctive relief against INS policies governing detention, arrest or interrogation of suspected aliens in force prior to January 3, 1983. *Illinois Migrant Council v. Pilliod*, No. 74 C 3111, and *Illinois Migrant Council v. Vandersall*, No. 75 C 3541 (N.D.Ill. Feb. 3, 1985) Final Order at ¶¶ 1–3.

lieved to be an alien as to his right to enter, reenter, pass through, or reside in the United States. The immigration laws must be construed to avoid absurd consequences and it would be manifestly impossible to ascertain whether a person, not caught in the act of entering the United States, was an alien illegally in the United States, and likely to escape, unless such person were questioned. This questioning, if conducted in a reasonable and businesslike manner would not amount to an arrest.

In questioning any person as to his right to reside in the country, alienage is the primary fact to be established, and the person accosted may well be asked to state his citizenship. If he replies that he is a citizen of the United States and there is not apparent reason to doubt his claim, the interrogation should not be pursued further.... If, on the contrary, he admits that he is an alien, the officer must then, in the performance of his duty, question him further to determine whether he is lawfully in the United States....

*Id.* at 5–6 (footnotes omitted).

At the time of the preliminary injunction, defendants argued that 8 U.S.C. § 1357(a)(1) authorized the conduct of which plaintiffs complained. That section provides:

(a) Any officer or employee of the [INS] authorized under regulations prescribed by the Attorney General shall have power without warrant—

(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;

. . . .

*Id.*

By the time of the parties' cross-motions for summary judgment, there was a noticeable change in written INS policy.

It is the policy of INS that officers may stop and question a person regarding his right to be or remain in the United States *on probable cause or reasonable suspicion based on specific articulable facts and rational inferences* drawn from those facts that the person is an alien.

Joint Stipulation of Uncontested Facts, ¶ 6 at 5, Appendix to Plaintiffs' Memorandum in Support of Summary Judgment, filed September 30, 1980 (emphasis added). Also included in the summary judgment materials were Operational Guidelines for Service Enforcement Officers, issued by the Regional Commissioner of INS on February 7, 1977 (1977 regional guidelines), which covered vehicle stops, questioning and searches and related pedestrian enforcement actions. The introductory paragraph to these guidelines began:

The powers, operational methods, and procedures of Service officers are now being more closely scrutinized and challenged than, perhaps, ever before. We are being questioned and contested by the public, the media, and in the courts. It is essential, therefore, that enforcement officers know about all important court decisions which have been brought to their attention and the attendant impact of such decisions upon their authority to enforce the immigration laws.

1977 regional guidelines at 1. *Illinois Migrant Council v. Pilliod* is one of the five cases discussed in these guidelines.

It is already recognized that the requirement of articulable facts justifying reasonable suspicion applies to forcible temporary stops in immigration pedestrian situations routinely encountered in such enforcement activities as area control, city scout, and related operations involved with the stopping and questioning of persons on the streets, in transportation terminals, in other public places, and in a variety of work situations. In the Northern District of Illinois the Government has lost an appeal from the injunction issued by the District Court in *Illinois Migrant Council v. Pilliod* ... [T]he sensitivity of the issue of stopping for questioning persons of hispanic descent is obvious, and officers everywhere will do well to keep it in mind at all times.

*Id.* at 5–6.

The "reasonable suspicion" standard for pedestrian stops is set forth as INS policy

in *The Law of Search and Seizure for Immigration Officers,* M–69 (issued by U.S. Department of Justice, Immigration and Naturalization Service, Rev. June, 1979) (1979 INS guidelines). These guidelines cite *Illinois Migrant Council* in their discussion of pedestrian stops. *Id.* at 9 nn. 10–11.

The revised *The Law of Arrest, Search, and Seizure for Immigration Officers,* M–69 (issued by U.S. Department of Justice, Immigration and Naturalization Service, Rev. Jan., 1983) (1983 INS guidelines) continues the "reasonable suspicion" standard for pedestrian questioning. *Illinois Migrant Council* is also cited in this revision. 1983 INS guidelines at 9 nn. 10–11 and 10 n. 11e.

Defendants explain these revisions in written INS policy as the correction of language, clarity and case citing problems. They argue that there has been no substantial change. "The language of the policy has been changed to more clearly state what in fact INS agents are to do and to provide a more current state [sic] of the law, but the underlying policy has remained the same." Defendants' Memorandum in Opposition to Plaintiffs' Application for Attorneys' Fees and Costs at 7.

Defendants' response falters in that it focuses only on written INS policy. Defendants have not addressed the divergence between written policy and actual practice which existed at the time this lawsuit was commenced. In *Illinois Migrant Council I,* we found:

> [T]he evidence shows that [the 1967 or 1971] guidelines are not being followed by the officers in the field and the plaintiffs have established a reasonable probability that the misconduct is widespread and not the result of isolated transgressions by a few agents. Thus, even if the written policy were constitutionally adequate, the course of conduct in the field has been impermissible.

398 F.Supp. at 903. Plaintiffs' lawsuit brought the disparity between policy and practice to light. The parties have not always agreed in their interpretations of the INS policy and practice with regard to pedestrian questioning. *See Illinois Migrant Council v. Pilliod,* 531 F.Supp. 1011, 1018 (N.D.Ill.1982) (*Illinois Migrant Council II*) (decision on cross-motions for summary judgment). But in their motion for voluntary dismissal, plaintiffs asserted that the voluntary change in INS policy obviated the need for further injunctive and declaratory relief. Thus, the conduct and practices of INS field agents now comport with its statement of the law and policy with regard to pedestrian stops. Plaintiffs have shown that this lawsuit was causally linked to the change in INS policy, both written and as applied. *Illinois Welfare Rights,* 723 F.2d at 566.

The second group of practices which plaintiffs challenged in this lawsuit relate to area control operations conducted by defendants in Rochelle and Mendota, Illinois. The details of these two series of raids are set forth in *Illinois Migrant Council I,* 398 F.Supp. at 888–91. The area control operations or raids involved the warrantless entries and searches of homes, dormitories, cottages and factories. It was also INS policy during these raids to station agents at all exits in order to prevent persons believed to be aliens from leaving the premises.

Here again defendants assert that there has been no substantial change in INS policy as a result of this litigation. We begin with the warrantless searches of dwellings during the area control operations.[5] Written INS policy at that time provided:

> *Entries into private dwellings.* The Fourth Amendment to the Constitution provides that the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. Buildings not in any way connected

---

**5.** We need not discuss separately the legality of defendants' warrantless entries and searches of the Del Monte plants at Rochelle and the Motor Wheel plant at Mendota. Plaintiffs lacked standing to challenge the entry into these plants.

*Illinois Migrant Council I,* 398 F.Supp. at 900. And the preliminary injunction in this action did not address the warrantless entry of *commercial* premises.

with the residence, also open space near the residence but not to be considered a part of it, may be searched without a warrant.... An officer may, however, enter a residence on permission of the person who claims ownership or right to possession of the premises, which person is the only one who can assert the right to immunity from search....

1967 INS guidelines at 6–7 (footnotes omitted).

At the time of the hearing on the motion for preliminary injunction, defendants conceded that no warrants had been issued and that they lacked probable cause. Instead, defendants asserted that all entries had been made with the consent of the occupants. *Illinois Migrant Council I,* 398 F.Supp. at 899–900. We observed:

It would be hypocrisy of the lowest order to hold that the knocks on the doors of the Del Monte dormitories and cottages and the Solis residence produced consent "voluntarily given and not the result of duress or coercion." ... To be true to the Fourth Amendment, these invasions of home and privacy in the dark of the early morning must be sternly rebuked.

*Id.* at 900 (citation and footnote omitted).

The 1979 INS guidelines gave several examples in the discussion of consent to search. *Illinois Migrant Council* is cited as support for the following: "While employers may consent to a search of work areas, they may not consent to the search of occupied dormitories or cottages which they may provide for their workers." 1979 INS guidelines at 25 n. 7. The same language appears in the 1983 guidelines. 1983 INS guidelines at 27 n. 7.

Defendants' argument that there has been no substantial change in policy ignores the gap between the INS field agents' conduct during the area control operations and official, written INS policy. As with the pedestrian stops, plaintiffs have shown a causal connection between this action and the change in INS policy as implemented.

The questioning of persons believed to be aliens during the area control operations overlaps with the issue of pedestrian stops. In both situations INS field agents interrogated persons of apparent Mexican descent as to their citizenship. *Illinois Migrant Council I,* 398 F.Supp. at 900. The factor which distinguishes the area control operations from the pedestrian stops is the manner in which the questioning occurred. Here INS field agents were posted at all exits to secure the premises and to prevent persons believed to be aliens from leaving the premises. We found that this INS policy resulted in "seizures" for purposes of the fourth amendment. *Illinois Migrant Council II,* 531 F.Supp. at 1018–19.

The 1967 INS guidelines, which were in effect at the time of the Rochelle and Mendota raids, did not address the subject of detention during area control operations. We have previously quoted those guidelines on the more general topic of "Questioning Persons."

The 1979 INS guidelines do not contain a separate section on the detention of persons believed to be aliens during area control operations. But these guidelines do cite *Illinois Migrant Council* when giving examples of unreasonable seizures. 1979 INS guidelines at 29 nn. 1–2.

The 1983 revision of the INS guidelines was more extensive. Our findings with regard to detention during area control operations were discussed at length.

[T]he Ninth Circuit and the District Court for the Northern District of Illinois have held that in a factory survey where officers are stationed at the exits so that the workers within can observe them, the entire workforce within is seized within the meaning of the Fourth Amendment.[11e] Any questioning of persons "seized" in this manner must be based upon a reasonable suspicion that the individual questioned is an alien illegally in the United States. The Solicitor General has authorized further review of both cases. Pending the ultimate resolution of these cases, special guidelines have been developed for operations in these jurisdictions and must be followed by all officers located there. Outside the Ninth Circuit and the Northern District of Illi-

nois, the law and policies stated in the above three paragraphs apply.

1983 INS Guidelines at 10 n. 11e. *See id.* at 11 nn. 14–15 and 12 n. 20–20a. It is clear that INS policy at least in this district has been changed as a result of the litigation commenced by plaintiffs.

Defendants argue that the results achieved by plaintiffs here are not substantial. The nature of declaratory and injunctive relief is such that it is difficult to quantify. Were this an action for damages plaintiffs could point to the monetary relief they received as a measure of their success. But here all the plaintiffs obtained was a declaration that defendants had violated their fourth amendment rights and an injunction which enjoined and restrained defendants from certain future practices. And in dismissing this action, plaintiffs voluntarily agreed to the dissolution of the preliminary injunction and vacation of the grant of partial summary judgment. Admittedly today they have nothing "in hand."

But what plaintiffs have accomplished here cannot be disregarded. On July 29, 1975 we granted plaintiffs' motion for preliminary injunction. That injunction, as modified, was in force and effect for a period of almost ten years. Although "preliminary" in name, the injunction which plaintiffs obtained had all of the force of a permanent injunction while it was in effect. 11 C. Wright and A. Miller, *Federal Practice and Procedure: Civil* § 2947 at 426–27 (1973). We cannot say that injunctive relief of this duration and the resulting change in INS policy are of no value. When we issued the preliminary injunction on July 29, 1975, we set the case for trial on the merits on October 9, 1975. Prior to the trial date we were assured during an off the record conference by the Assistant United States Attorney then assigned to the case that it would be settled by the government consenting to a permanent injunction. We vacated the trial date. Another assistant was assigned to the case. The rest is history. We hold that plaintiffs are prevailing parties.

*The Position of the United States*

█ Before awarding fees to a prevailing party under the Equal Access to Justice Act, we must consider whether the position of the United States in this action was substantially justified. 28 U.S.C.A. § 2412(d)(1)(A) (West Supp.1987). Defendants acknowledge that they bear the burden of proof on this issue.

In the 1985 amendments to the Act, Congress clarified a question as to whether pre-litigation conduct is to be considered in making this determination.

... Whether or not the position of the United States was substantially justified shall be determined on the basis of the record (including the record with respect to the action or failure to act by the agency upon which the civil action is based) which is made in the civil action for which fees and other expenses are sought.

28 U.S.C.A. § 2412(D)(1)(B) (West Supp. 1987). *See also id.* § 2412(d)(2)(D) (definition of "position of United States").

Defendants have not addressed pre-litigation agency action in arguing that their position before this court was substantially justified. We recognize that the Equal Access to Justice Act was amended while the parties were briefing this motion for fees. But plaintiffs' reply brief cites the amendment. Curiously, defendants have not supplemented their memorandum.

Defendants first suggest that we consider the votes taken in the court of appeals as an indication that their litigation position during the preliminary injunction hearing and on appeal had a reasonable basis in law and fact. The initial panel which reviewed the preliminary injunction affirmed our decision, with Judge Tone dissenting. *Illinois Migrant Council v. Pilliod,* 540 F.2d 1062 (7th Cir.1976). Rehearing *en banc* was granted. A one-page decision was issued following rehearing. *Illinois Migrant Council v. Pilliod,* 548 F.2d 715 (7th Cir.1977). Three judges voted to affirm. Four judges voted to reverse and completely vacate the injunction. And Judge Wood voted to reverse and vacate only paragraph (b) of the preliminary injunction. He voted

to affirm the remainder of our order. Apart from the court's direction to modify paragraph (b), the one-page order contains no discussion. We can only speculate as to the reasoning of those judges who voted to reverse and completely vacate the injunction. Such speculation hardly forms the basis for a finding that the government's litigation position was substantially justified. The fact is the preliminary injunction was affirmed as modified and remained in effect for ten years.

Defendants also find support for the reasonableness of their litigation position in the Supreme Court's decision in *Immigration and Naturalization Service v. Delgado*, 466 U.S. 210, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). There the Court found that factory surveys did not result in the seizure of the entire work force, and that individual questioning by INS agents as to a person's citizenship did not amount to a detention or seizure under the fourth amendment.

Plaintiffs' response to *Delgado* is twofold. First, they distinguish *Delgado* on its facts. In *Delgado* the Court found nothing in the record to show that agents were stationed near the factory doors with the intent to prevent people from leaving. 104 S.Ct. at 1763. Here, the government stipulated that the INS field agents were instructed to prevent persons from leaving. *Illinois Migrant Council II*, 531 F.Supp. at 1019. Secondly, plaintiffs assert that defendants' position should be evaluated by reference to the law as it existed when the government was litigating this case.

We have reviewed the record and find that *Delgado* is cited for the first time by defendants in opposition to plaintiffs' motion for attorneys' fees. While we cannot ignore this Supreme Court decision, we find it inappropriate to speculate on this decision's impact on this litigation. *Delgado* was decided on April 17, 1984. Thereafter defendants took no action to vacate the partial summary judgment granted on the area control operation detention issue. It may be that application of *Delgado* to the facts of this case would warrant a ruling in defendants' favor; but the parties have not developed or argued the detention issue with that case in mind. To hold now that *Delgado* would have barred plaintiffs' detention claims, based on the record before us, would be pure speculation.

Defendants' third argument in support of its litigation position is that the INS has complied and continues to comply with the law.

> The defendants ... assert that all operations of the INS were and will continue to be conducted in conformance with the Fourth Amendment and 8 U.S.C. § 1357(a)(1) (1970), and to the extent that excesses may have occurred, the incidents were isolated and do not establish a pattern or practice of illegal conduct.

*Illinois Migrant Council I*, 398 F.Supp. at 886. Defendants then point out that in nearly eleven years only one other "incident" has been aired before this court. Given the existence of the preliminary injunction for almost ten years out of this eleven year period, we would have expected all "incidents" to cease. Defendants do not explain how even isolated incidents which result in the deprivation of constitutional rights can be said to be conduct on the part of defendants which is substantially justified.

Defendants' final argument is that they were justified in opposing the motion for preliminary injunction because plaintiffs had an adequate remedy at law. We addressed this point in *Illinois Migrant Council I*, 398 F.Supp. at 904:

> Despite the possibility of recovering damages, a remedy the plaintiffs do not seek, money damages are not an adequate remedy at law when a pattern of unconstitutional deprivation of rights is established....

(citations omitted).

The Equal Access to Justice Act instructs us to consider the record as a whole in determining whether the position of the United States was substantially justified. 28 U.S.C.A. § 2412(d)(1)(B) (West Supp. 1987). Defendants raise only four arguments in support of their position in this case. These arguments do not discuss de-

fendants' pre-litigation conduct; nor do they address all issues raised in this case.

At the time of the preliminary injunction, defendants sought to justify their conduct in questioning pedestrians as to their citizenship as permitted under 8 U.S.C. § 1357(a)(1). In *Illinois Migrant Council I*, we discussed that section and the major Supreme Court cases limiting the agency's authority under the statute.[6] 398 F.Supp. at 892–99. Defendants have not argued here that their reliance on 8 U.S.C. § 1357(a)(1) was substantially justified.

A second issue not addressed by defendants is their warrantless entries and searches of various types of dwellings during the area control operations. That conduct clearly violated the fourth amendment. *Illinois Migrant Council I*, 398 F.Supp. at 899–900.

Considering the record as a whole, we find that defendants have failed to meet their burden of showing that the position of the United States in this action was substantially justified.

*A "Reasonable" Attorneys' Fee*

Having found that plaintiffs are prevailing parties and that the position of the United States in this action was not substantially justified, we must determine a reasonable fee for plaintiffs' counsel.

We are guided by the Supreme Court's discussion in *Hensley v. Eckerhart*, 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services. The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where documentation of hours is inadequate, the district court may reduce the award accordingly.

*Id.* at 433, 103 S.Ct. at 1939.

Plaintiffs initially sought compensation in the amount of $227,761.25 for 3,820.25 hours. The maximum hourly rate for counsel was the $75.00 statutory maximum. On May 19, 1986 counsel for plaintiffs suggested that we have the discretion to increase the maximum rate of reimbursement under the Act to reflect an increase in the cost of living, 28 U.S.C.A. § 2412(d)(2)(A) (West Supp.1987); *Continental Web Press, Inc. v. National Labor Relations Board*, 767 F.2d 321, 323–24 (7th Cir.1985) (rate approved was $82.95), which we have recently done, *Ruiz v. Bowen*, No. 84 C 7394 (N.D.Ill., Feb. 19, 1987). Plaintiffs' application is supported by the affidavits of the nine attorneys and one paralegal who worked on the case.

■ Defendants' first objection to the application for fees is the inadequate documentation of 2,215.9 hours expended by plaintiffs' counsel. Three out of the nine attorneys who represented plaintiffs in this action estimated a portion of the total number of hours they worked. And one attorney did not include activity descriptions in his contemporaneously recorded time records. Defendants submit that these estimates are inadequate under *Hensley* and *Cauley v. Wilson*, 754 F.2d 769, 772 (7th Cir.1985).

In *Cauley* the district court awarded $7,500 to defendant's attorney. The Seventh Circuit remanded for a new determination of fees because defendant failed to offer sufficiently detailed proof of services rendered.

Wilson's attorney submitted a two-page affidavit and a one-page itemization of attorney's fees which stated that the attorney spent twenty-five hours on researching, drafting, and filing pleadings, eighty hours on discovery, and forty hours on trial preparation. Charging $100 per hour, Wilson's attorney requested an award of $14,500; the district court

---

**6.** Cases discussed included *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed. 2d 607 (1975); *United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975); and *Almeida–Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973).

awarded $7,500. The showing is inadequate to support either amount.

*Id.* at 772.

Plaintiffs' presentation here is more extensive than that in *Cauley.* For example, in his affidavit, Bruce Goldsmith states:

The following itemization of hours includes an estimate of hours worked from September 1, 1974 through June 20, 1977. These estimates were computed by reviewing the court docket, pleadings and litigation files, transcripts of hearings and depositions, and contemporaneous time records of co-counsel. The following itemization also includes a computation of hours worked from June 20, 1977 through the present, compiled through contemporaneously kept time records. The complete itemization sets forth the nature and hours of work that I have spent on this case and for which fees are now claimed.

Goldsmith affidavit, ¶ 5, Exhibit C to Application for Attorneys' Fees. The itemization of the estimated hours which follows fills five pages. The itemization made from the contemporaneously kept time records fills eight pages. The affidavits of F. Thomas Hecht and Vincent H. Beckman contain itemizations of a similar nature and length. Attorney David Goldberger (now Professor of Law, Ohio State University) maintained contemporaneous time records, which apparently did not describe in full the services rendered. In his affidavit, he states that description of the activity performed was derived from contemporaneous time records, docket entries or his own memory. Affidavit of David Goldberger, ¶ 4, Exhibit B to Application for Attorneys' Fees.

After reviewing the extensive estimates of services performed submitted by plaintiffs' counsel, we find that this documentation is adequate and that plaintiffs should not be penalized for their failure to keep contemporaneous time records prior to the enactment of the Equal Access to Justice Act. Furthermore, the total time for which compensation is sought—3800 hours—is, in our judgment and experience, exceptionally reasonable for cases of the complexity, adversity and length of this case.

■ The next factor to be considered is the reasonableness of each lawyer's billing rate. Nine attorneys and one paralegal performed services on behalf of plaintiffs. For eight of the attorneys plaintiffs seek compensation at the maximum statutory rate of $75.00 per hour plus an increase for the cost of living. Counsel have provided us with individual statements as to their background and experience. Apart from the citation of *Continental Web Press,* 767 F.2d 321 (7th Cir.1985), counsel have not suggested what overall rate is appropriate to reflect an increase in the cost of living since the enactment of the Equal Access to Justice Act. The $82.95 per hour awarded in *Continental Web Press* includes a 10.6% increase in the statutory rate to reflect inflation. We recently awarded $90 per hour. *Ruiz v. Bowen, supra.* We find that $90.00 is a reasonable hourly rate for Messrs. Alop, Goldberger, Goldsmith, Lehrer, and Romero and for Ms. Poplawski, given their skill and experience.

■ The other two attorneys for whom plaintiffs seek compensation at the statutory maximum were newly admitted. F. Thomas Hecht graduated from the University of Chicago Law School in June, 1975. He began work on this case in late September, 1975. Vincent H. Beckman is a 1974 graduate of Northwestern School of Law. He began his work here in June of 1975. While $75.00 or $90.00 would be excessive for their beginning work on this case, it became an appropriate hourly rate after they had worked on the case for three years. Plaintiffs are awarded $50 per hour for Hecht's and Beckman's services through 1978 and $90 per hour thereafter.

■ Attorney Phillip R. Riley is a 1982 graduate of Antioch School of Law. Illinois Migrant Council was one of his first cases. Plaintiffs seek compensation for the hours he expended at $50.00 per hour. That is a reasonable hourly rate for Mr. Riley's services.

■ Finally, plaintiffs seek compensation for the services rendered by paralegal

Oscar Martinez at the rate of $40.00 per hour. Defendants have not objected to this request. We decline to reimburse plaintiffs' counsel for Mr. Martinez's services at the rate of $40.00 per hour. Plaintiffs' counsel may be reimbursed for the paralegal's services at their actual cost to them.

■ We turn to whether the time spent by plaintiffs' counsel in this case was reasonably expended. Earlier we noted that the total of 3800 hours for litigation of the complexity, adversity and length of this case was reasonable. Defendants dispute that it was and draw our particular attention to the time spent on plaintiffs' brief on appeal from our January 19, 1982 opinion. They point out that seven different attorneys spent 724.35 hours on the appeal. Of this total, only 78 hours were claimed by Mr. Hecht, who presented the oral argument. Defendants also compare this figure to the total hours claimed by David Goldberger (734.5) for his work from January, 1975 to April, 1977. While defendants state that the affidavits are replete with numerous examples of hours not reasonably expended, the 1982 brief in the court of appeals is the only example which they discuss in detail.

The parties have not provided us with any guideline for assessing this expenditure of time, other than our own experience as a lawyer and judge. Competent appellate lawyering is a painstaking, time-consuming pursuit, frequently engaged in by a team of two or more. Research, writing, and editing are "easy" tasks only for those who do not engage in them. However, the job should have been done in less time. We conclude the time spent was excessive when viewed in the totality of the case. We reduce this block of time by 300 hours to 424.35 hours.

■ Our determination of a proper fee in this case does not end with the product of reasonable hours times a reasonable rate. Under *Hensley* where a plaintiff has succeeded on only some of his claims for relief, we must consider two additional questions.

First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?

461 U.S. at 434, 103 S.Ct. at 1940.

Plaintiffs have simplified our task somewhat by voluntarily excluding from their application for fees all time expended upon their 1980 motion for summary judgment. They have also excluded time spent in presenting their third motion for contempt sanctions.

Defendants assert there is no basis for distinguishing between plaintiffs' first two contempt motions and their third. They argue that plaintiffs should not be compensated for the contempt motions which were filed but not resolved prior to dismissal.

The record on the contempt motions is not clear. The parties' briefs contain a minimal discussion and no procedural history. The matter was drawn out. Plaintiffs' first motion for issuance of an order to show cause was filed on March 2, 1976. This motion concerned two area control operations: one at the Air Balance Corporation, 3100 West Grand Avenue, Chicago (INS had a search warrant), and the second at the Universal Furniture Corporation 7361 South Meade, Bedford Park, Illinois. On February 28, 1980 we granted plaintiffs leave to file an amended contempt motion. This motion was general in nature and alleged that "Defendants promulgated, encouraged, and supported policies and practices which were in clear and deliberate violation of the injunctive orders issued by this Court." No specific instances were cited in this second motion. These first two contempt motions were not pressed and were not ruled upon prior to the dismissal of February 11, 1985.

Plaintiffs' third motion for issuance of a show cause order was filed on April 23, 1981. That motion concerned the search with a warrant of three apartments at the Belle–Shore Apartment Hotel, 1062 West Bryn Mawr Avenue, Chicago, Illinois. A hearing was held on this motion on June 1–4, 1981. On June 4, 1981 we ruled orally

from the bench and denied plaintiffs' motion for contempt.

Plaintiffs urge that the time devoted to the first two contempt motions should not be excluded because these matters do not constitute claims which are "distinct in all respects" from the claims on which they were successful. This is the extent of plaintiffs' response.

Defendants see the contempt petitions as distinct claims, and because plaintiffs did not prevail on the first two petitions, defendants argue, they are not entitled to be compensated. We agree with defendants and order exclusion of the time devoted to the first two contempt motions.

Defendants also argue that plaintiffs seek fees for unsuccessful claims asserted in the *Vandersall* case. In reply, plaintiffs state that all time expended solely on *Vandersall* has been excised from their fee application. The overlap in deposition costs will be dealt with in our discussion of the bills of costs.

### BILLS OF COSTS

Both parties to this action seek costs: plaintiffs in *Illinois Migrant Council*, 74 C 3111, and defendants in *Vandersall*, 75 C 3541.

We begin with defendants' bill of costs. Plaintiffs deny that defendants are entitled to costs. Defendants submit that the dismissal of the *Vandersall* complaint means that they are prevailing parties.

Under Rule 54(d), Fed.R.Civ.P., "costs shall be allowed as of course to the prevailing party unless the court otherwise directs." At the time we dismissed plaintiffs' action in *Vandersall*, we specifically reserved the question of costs. We now hold that in *Vandersall* defendants were the prevailing parties and are entitled to costs in the amount of $1,677.75 in accord with their cost memorandum.

Moving on to the plaintiffs' bill of costs in *Illinois Migrant Council*, defendants first object to the deposition costs. Certain joint depositions were taken in *Illinois Migrant Council* and *Vandersall*. The parties are not in agreement as to the proper allocation of these costs. Defendants have suggested that the plaintiffs in *Illinois Migrant Council* reduce their deposition costs by 25% due to the overlap. Plaintiffs' reply is not much help. They state the following:

(a) in many instances the only references to *Vandersall* or any issue therein is the style and caption of the consolidated cases;

(b) the deposition transcripts included in the bill of costs concern primarily matters relating solely to *Illinois Migrant Council;*

(c) certain deposition transcripts concerned issues in both cases;

(d) the *Vandersall* portion of the depositions in (c) above averaged approximately 20%; and

(e) none of the depositions pertained solely to *Vandersall.*

Costs are like any other claim—the amount sought must be sustained by the party seeking them. Plaintiffs had the burden to untangle the commingling. They have not done so. Defendants' proposed 25% reduction is approved.

Defendants' second objection to plaintiffs' bill of costs is that it includes $3,859.63 in "other costs" which are not allowable under 28 U.S.C. § 1920. Defendants have not itemized the "other costs" which they seek to exclude. Their objections also overlook that plaintiffs' counsel are entitled to recover their expenses as well as fees under the Equal Access to Justice Act.

The parties are directed to compute fees, expenses and costs in accord with the views herein expressed and present a consolidated, itemized, net judgment order in favor of plaintiffs.